# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**THE UNITED STATES OF AMERICA,**

      **Plaintiff,**

      **vs.**                       **No. CR 05-1849 JH**

**DANA JARVIS, et al.,**

      **Defendants.**

### DEFENDANTS' JOINT REPLY TO THE GOVERNMENT'S RESPONSE (DOC. # 614) TO THE DEFENDANTS' JOINT MOTION TO COMPEL DISCOVERY RELATED TO THE INTERCEPTION OF ELECTRONIC COMMUNICATIONS (DOC. #573), OR, IN THE ALTERNATIVE, A MOTION TO RECONSIDER THE COURT'S PARTIAL DENIAL (DOC. # 733) OF THE DEFENDANTS' MOTION (DOC. #573)

The Defendants hereby jointly and respectfully reply to the government's response (Doc. 614) to the Defendants' motion to compel discovery related to the interception of electronic communications (Doc. 573, hereinafter referred to as the discovery motion). In the alternative, the Defendants hereby respectfully request the Court to reconsider its partial denial (Doc. 733) of the discovery motion.

1.    **The Court should permit the Defendants to file this reply, or in the alternative, consider this to be a motion to reconsider.**

  A.    **The Government failed to serve its response on the attorney who filed the Defendants' motion to which the Government was responding.**

On July 14, 2006, undersigned counsel filed the discovery motion.  *See* Doc. 573.  In early August or late July, 2006, Assistant United States Attorney Greg Fourrat left a voice mail for Mr. Davidson, stating that he was working on the response for James Braun, who was out of the office on paternity leave, and requesting an extension of time within which to file the response on behalf of the Government.  Undersigned counsel called back, leaving a voice mail, saying that undersigned counsel did not oppose the Government's taking additional time to respond to the discovery motion.  Neither Mr. Braun nor Mr. Fourrat called undersigned counsel indicating when the Government intended to file a response. Believing that perhaps the filing of a response might have "slipped through the cracks" and escaped Mr. Braun's notice upon return from paternity leave, or that perhaps there might have been a mis-communication within the United States Attorneys' office as to whom was responsible for drafting and filing a response to the discovery motion, undersigned counsel called Mr. Braun in late September, 2006,

and left a voice mail message inquiring about the status of the Government's response. Mr. Braun returned the call and informed undersigned counsel that the Government had filed a response in early August. Undersigned counsel told Mr. Braun that he had not received that response and was not aware, prior to Mr. Braun's announcement, that such a response had been filed. Mr. Braun acknowledged that undersigned counsel may not have been served. Undersigned counsel confirmed that in fact he had not been served. To date, undersigned counsel has not been served with a copy of the government's response to the discovery motion. After receiving a copy of the Court's partial denial and partial grant of the discovery motion, undersigned counsel obtained a copy of the government's response from the Court's online docket and began preparing this motion to reconsider.

**B.      The Court's partial denial of the discovery motion rests, in part, on the lack of a reply.**

In its October 24 order partially granting and partially denying the discovery motion, this Court stated that with respect to twelve of the categories of documents the Defendants "failed to file a reply brief and therefore did not respond to the Government's argument." Doc. 773 at 1. The Court denied the discovery request

with respect to these categories "because Defendants have failed to come forward with a sufficient explanation of the grounds that support their contention that they are entitled to those materials."  Doc. 773 at 2.  The Court also ruled in the alternative with respect to each of these categories.

### C.    The Government does not oppose the Defendants' request to file a reply or move to reconsider.

Undersigned counsel conferred with Mr. Braun, inquiring as to the Government's position on a motion to file a reply or to reconsider.  The Government indicated that it does not oppose the Defendants' filing a reply or filing a motion to reconsider.  Although the Government opposes the substance of the Defendants' instant motion and opposes reconsideration of the order on the merits, the Government does not oppose the Defendants' having an opportunity to present these arguments to the Court.  In an email sent to undersigned counsel on October 25, 2006, Mr. Braun stated, "I do not oppose you filing a motion to reconsider in place of a reply since it appears that a copy of our response was not sent to you.  Of course, I do oppose the motion to reconsider on the merits." (Email message sent from James Braun to undersigned counsel on Wed. 25 Oct 2006 14:17:50, subject: motion to reconsider.)

**D.     It is in the interest of justice that Defendants be permitted to address the Government's response on the merits.**

It is in the interest of justice to permit the Defendants to respond to the Government's response to the discovery motion.   The following argument represents the Defendants' reply to the Government's response, or in the alternative, the Defendants' motion to reconsider the partial denial of the discovery motion with respect to categories 3, 5, 6, 8, 12, 13, 14, 16 and 17.[1]

**2.     The Court should order the Government to produce documents and materials in categories 3, 5, 6, 8, 12, 13, 14, 16 and 17.**

**A.     Category 3: policy regarding approval of request for authorization of electronic communications intercept order.**

The Defendants are entitled to the documents and materials described in Category 3 for four reasons.   *See* Doc. 573 at 3-4 (describing the materials sought in category 3).

---

[1]The Defendants have omitted category 9 because the grand jury transcripts are the subject of another motion.  *See* Doc. 719.  The Defendants have omitted category 2 because the Government has agreed to produce the requested chain of custody records.  *See* Doc. 614 at 1 (stating that the Government has "already produced some of the requested chain of custody reports to the defense, and that it would provide the defense with any additional reports that had not already been produced").  The Defendants have omitted category 10 because the Court has ordered the Government to "produce to Defendants in a timely manner all evidence that impeaches any Government witness," pursuant to *Giglio v. United States*, 405 U.S. 150 (1972).  The Defendants have omitted category 11 because the Government has stated "that it has no documents to produce."  Doc. 733 at 2.

First, these documents will show the law enforcement agencies' policies regarding the use of contract personnel in the wiretap process. This is material to the question of necessity for extensions of the wiretap and also relevant to the question of minimization of interceptions in this wiretap. If contract personnel with improper or inadequate training in wiretap procedures were employed, then there is a substantial risk of noncompliance with minimization requirements. The use of contract personnel would show that the initial wiretap period was improperly conducted, normal investigative techniques were not employed, and extensions of the wiretap were not necessary.

Second, these documents will show the law enforcement agencies' policies with respect to the preservation of evidence obtained in the course of the investigation prior to the wiretap and also during the wiretap. For instance, if the law enforcement agencies' policies with respect to preservation of evidence are inadequate, it will undercut the Government's claim that the wiretap was necessary, that traditional investigative techniques were inadequate, that additional wiretaps were needed, and that minimization requirements were complied with. This information is directly relevant to the question of necessity for the initial wiretap, the question of necessity for extensions of the wiretap, and the question of

6

minimization.

Third, law enforcement agencies' policies with respect to requesting such wiretaps will reveal whether or not internal budgetary concerns motivated the use of a wiretap in this non-violent marijuana trafficking case. As a matter of bureaucratic necessity or inertia, drug task forces sometimes have an institutional need to participate in or conduct wiretaps to justify their budgets. If there is a budgetary component to the motivation to request authorization for this wiretap, it will undercut the Government's claim that the wiretap was necessary, and bolster the Defendants' contention that the wiretap in this case violated the necessity requirements under Title III.

Fourth, in these types of investigations, draft applications for a wiretap are sometimes pre-submitted to a judge, for comment by the judge, with subsequent changes made prior to the submission of the official application for a wiretap authorization. If any such drafts were submitted in this case, either for the original wiretap authorization, or for any of the extensions, changes in those drafts, and/or in the supporting affidavit, will be directly relevant to the question of necessity. In addition, such changes will be directly relevant to questions of the credibility of the affiant, material omissions or mis-representations in the final affidavit, and the need

for a *Franks* hearing.

## B.    Category 5: net worth records.

The Defendants are entitled to the documents and materials described in Category 5 for two reasons.  *See* Doc. 573 at 4 (describing documents and materials described in category 5).

First, in law enforcement investigations of drug trafficking organizations and money laundering, obtaining net worth records is one of the traditional, ordinary investigative techniques.  Such records often show where drug proceeds have been channeled.  These records are easy for the DEA and task force agencies to obtain from financial institutions.  There is little or no risk that the targets of these investigations will detect that these records have been sought and obtained.  The DEA has financial investigation units or teams that commonly and routinely conduct these sorts of investigations.  Consequently, the existence of these records is directly relevant to the necessity for the intrusive step of conducting electronic surveillance because they will show what evidence the Government had in its possession prior to the wiretap.  The absence of such records will reveal that this normal, traditional investigative technique was not utilized prior to the wiretap, undercutting the Government's assertion that the wiretap was necessary and that

traditional investigative techniques were unsuccessful.

Second, the failure to conduct such an investigation prior to the wiretap application would cast doubt on the credibility of the affiant, insofar as he claimed under oath that "the interception of wire communications is the only available technique that has a reasonable likelihood of achieving all the objectives of this investigation and securing the evidence necessary to prove beyond a reasonable doubt that the SUBJECTS and others as yet unknown are engaged in the above-described offenses." Stark Affidavit (March 3, 2005) at 34-35, ¶ 72.

## C.    Category 6: reports of financial analyses.

The Defendants are entitled to the documents and materials described in Category 6 for the same reasons that apply to net worth records. *See* Doc. 573 at 5 (describing documents and materials described in category 6). In drug trafficking and money laundering investigations, these analyses and reports are routinely generated because they show where the drug proceeds have been channeled. These analyses are part of the normal, traditional investigative techniques used in these investigations and they have the virtue of being easily obtained, with little or no risk of detection by the subjects of the investigation. For instance, these reports could show that the DEA had abundant information as to who was involved in the

organization, the quantities of drugs involved, the quantity of money being handled, and so forth, making the wiretap unnecessary, in violation of Title III. The information in these reports and analyses is directly relevant to the question of necessity for the wiretap.

### D.     Category 8: telephone records.

The Defendants are entitled to the documents and materials described in Category 8 for two reasons. *See* Doc. 573 at 5-6 (describing documents and materials described in category 8).

First, records of telephone calls prior to the initiation of the wiretap are important indicators of whether or not there was a necessity for an intrusive interception of thousands of private telephone conversations. In ¶ 70 of the March 3, 2005, affidavit in support of the application for the wiretap, Special Agent Stark referred to "toll records available to me." The types of telephone records sought contain the telephone number, the name and address of the subscriber, the time period of calls made on those phones, and the number of calls within that time period. *See, e.g.,* ¶ 70 of March 3, 2005 Stark Affidavit. These records are akin to pen register records or trap and trace records. Records of this nature are "clearly included under [Rule 16(a)(1)(C)] as discovery objects to which defendants are

entitled." *United States v. Feola*, 651 F. Supp. 1068, 1144 (S.D.N.Y. 1987). The telephone records will shine light on the nature and quantity of information in the Government's possession at the time it applied for authorization to conduct the wiretap.

Second, obtaining these types of telephone records is one of the initial steps a law enforcement agency customarily takes in the course of a drug trafficking investigation. It is a normal, traditional investigative technique that should have been explored prior to the request for a far-more-intrusive continuous wiretap of the content of conversations. This investigative technique has the advantage of being undetectable by the targets, without the intrusiveness of the wiretap. The use of this technique has direct bearing on the question of the necessity for the wiretap. The absence of the use of this technique would significantly undercut the Government's assertion that a Title III wiretap was necessary.

E.    **Category 12: imprisonment records of individuals.**

The Defendants are entitled to the documents and materials described in Category 12 for two reasons. *See* Doc. 573 at 7 (describing documents and materials described in category 12).

First, obtaining this type of information is a traditional investigative technique in the course of a criminal investigation. It is of particular importance in an investigation of a drug trafficking conspiracy or a money laundering conspiracy. When a target of the investigation is incarcerated, there is no need for a Title III wiretap because that person's telephone calls are already subject to surveillance by the detention facility. Consequently, this information is directly relevant to the question of necessity for the Title III wiretap. Furthermore, the Defendants cannot undertake a full necessity analysis without knowing whether or not the telephone conversations of some of the target individuals have already been recorded.

Second, individuals on probation or parole often have additional incentives to cooperate with law enforcement investigators. The Government's application for these wiretaps is predicated on the futility of pursuing other means of getting the same information: "your Affiant believes that, at this stage of the investigation, the use of cooperating sources is unlikely to achieve the goals of the investigation." *See* Stark Affidavit (March 3, 2005) at 38, ¶ 79. The records in the Government's possession pertaining to the "detention, imprisonment, incarceration, probation, supervision, or parole" of the individuals referred to the affidavit are directly relevant to the question whether the use of cooperating sources was adequately

pursued by the Government.  This, in turn, pertains to the question of the necessity for the Title III wiretap as well as to the credibility of the Affiant and the need for a *Franks* hearing.

### F.    Category 13: Surveillance logs and related records.

The Defendants are entitled to the documents and materials described in Category 13 for two reasons.  *See* Doc. 573 at 7-8 (describing documents and materials described in category 13).

First, the Defendants are entitled to know what the law enforcement officers observed prior to the Government's application for a Title III wiretap because this is directly relevant to the question of necessity.  To clarify, the surveillance logs sought by the Defendants should be distinguished from "the ideas, thoughts, and work product of government employees conducting an investigation."  Doc. 733 at 3.  The Defendants do not claim entitlement to the thoughts of government employees conducting this investigation.  But the Defendants do claim entitlement to records showing what the law enforcement agents and officials observed.  According to a leading treatise on the law of electronic surveillance, courts should "allow discovery of surveillance records prior to the suppression hearing."  2 James G. Carr & Patricia L. Bellia, **The Law of Electronic Surveillance** § 6:29 at 6-67 (2004).

The surveillance logs will show the observations of law enforcement officials during their surveillance.  These logs constitute an evidentiary record of the agents' and officers' observations, not the communications among law enforcement officials or between these officials and the prosecutor.

It is customary for law enforcement officials to preserve a record of their investigation so that, if called to testify at an evidentiary hearing or trial months or years later, they will have a record with which to refresh their recollection.  It is inconceivable that these officers and agents made no record of their observations while they conducted surveillance.  The only sorts of surveillance logs sought by the Defendants are those that would show what the officers and agents observed, when they observed it, where they observed it, and other pertinent information contained in those logs or reports.  For instance, a surveillance log or record might state that agent A observed target individual B meet with another individual C on a particular date, at a particular time, in a particular location, for a particular period of time. It might also state where B went after the meeting and where C went after the meeting.

These records are directly relevant to the question of the necessity for the Title III wiretap insofar as they will show how much information the Government had obtained, and how successful various investigative techniques proved to be in this

case.

Second, the information contained in the surveillance records and logs will cast light on the credibility of the affiant's statement that normal investigative techniques had been tried and failed. If these techniques were successful or were insufficiently employed, then a *Franks* hearing may be necessary to determine whether or not the affiant made material omissions or material misrepresentations in the affidavit in support of the application for the Title III wiretap.

### G.    Category 14: Wiretap facility sign-in sheets and related records.

The Defendants are entitled to the documents and materials described in Category 14 for six reasons. *See* Doc. 573 at 8 (describing documents and materials described in category 14).

First, the sign-in sheets for the wiretap facility or room are directly relevant to the question whether the Government failed to comply with Title III minimization requirements. The wiretap room or facility is a place where evidence is gathered and preserved. It should be locked and there should be strict controls on who may enter the room during the wiretap, to ensure that the equipment and the evidence are not tampered with. Hence, the security of the wiretap room or facility is extremely important. For this reason, sign-in sheets are standard operating

procedure in wiretaps conducted by the FBI. The sign-in sheets are directly relevant to the question of minimization insofar as they will reveal who was allowed in and what sorts of records were kept to ensure proper minimization and compliance with evidence preservation requirements. *Cf. United States v. King*, 991 F. Supp. 77, 91 (E.D.N.Y. 1998) (noting that courts analyzing whether minimization requirements were met examine whether "surveillance is being supervised by the prosecutor." (Citing *United States v. Rizzo*, 491 F.2d 215, 217 (2nd Cir. 1974); *United States v. Santoro*, 647 F. Supp. 153, 160-61 (E.D.N.Y. 1986)).

Second, if the sign-in sheets reveal an unusually large number of individuals in the wiretap room or facility, the resulting distractions could result in violation of minimization procedures. Furthermore, if the supervisor of the wiretap tolerated an unreasonably large number of individuals in the wiretap room or facility, it could show a flagrant disregard for minimization procedures, resulting in blanket suppression. *See United States v. Suquet*, 547 F. Supp. 1034, 1040-41 (N.D.Ill. 1982); *see also United States v. Parks*, 1997 WL 136761, *11 (N.D. Ill. 1997), *aff'd sub nom. United States v. Jackson*, 207 F.3d 910 (7th Cir.), *vacated and remanded in light of Apprendi v. New Jersey*, 530 U.S. 466 (2000), *by* 531 U.S. 953 (2000) (dictum).

Third, the presence of an unusually large number of individuals is directly relevant to the question of necessity for extensions of the wiretap. The use of a wiretap does not put a stop to the use of normal, traditional investigative techniques. While telephone conversations are being intercepted live, agents and officers are dispatched to conduct surveillance and pursue leads. The information gathered through this process might make an extension of the wiretap unnecessary and in violation of Title III. If security procedures were not properly adhered to during the first thirty-day period, then this may show there were missed opportunities to gather evidence, making extensions of the wiretap unnecessary. Consequently, the sign-in sheets for each phase of the wiretap are directly relevant to the question of necessity for subsequent phases or extensions of the wiretap.

Fourth, if sign-in sheets show that wiretap room security procedures were inadequate, this would undermine the credibility of the affiant insofar as he claimed that extensions of the wiretap were needed because normal investigative techniques were tried and failed.

Fifth, the sign-in sheets will show whether or not, and to what extent, contract personnel were used in the course of the monitoring. This, in turn, is directly relevant to the question of minimization. Law enforcement officials with proper

training and a wealth of experience with TitleIII and the minimization procedures customarily used to ensure such compliance are more likely to comply with the law than part-time, temporary contract personnel with little or no experience and with little or no training in proper minimization practices. The sign-in sheets are directly relevant to the question of minimization for this reason.

Sixth, the maintenance of monitoring logs is relevant to the Court's determination whether or not the Government violated Title III minimization requirements. *See King*, 991 F. Supp. at 91 (noting that courts consider "whether monitoring logs are maintained" in determining whether Title III minimization requirements were met); *see also Rizzo*, 491 F. 2d at 217; *United States v. Hinton*, 543 F.2d 1002, 1011-12 (2dn Cir. 1976). The Government has admitted that it failed to maintain "minimization logs" for the wiretap in this case. *See* Doc. 614 at 5 ("There are no other 'minimization logs.'"). The only record of minimization appears to be some paltry information contained on the "line sheets" for each call. Doc. 614 at 5. Other than this, which cannot be considered a log, the Government apparently failed to keep minimization logs. The Defendants are entitled to the sign-in sheets and related information in Category 14 because these materials and documents are needed to determine whether or not the Government violated Title III by failing to

properly minimize the interception of communications.

### H.    Category 16: Minimization training records.

The Defendants are entitled to the documents and materials described in Category 16 for three reasons. *See* Doc. 573 at 8-9 (describing documents and materials described in category 16).

First, it is a common practice in a wiretap under Title III to post the minimization instructions at each listening post, so that the monitors may readily refer to them. This is particularly important whenever contract personnel are utilized. The minimization materials sought by the Defendants are directly relevant to whether or not the Government made reasonable and sufficient efforts to comply with Title III's strict minimization requirements. The Defendants must have access to this information in order to conduct a full analysis of the Government's compliance or non-compliance with Title III minimization requirements.

Second, if a monitor listening to private conversations has not received proper training, there is a reasonable inference that the Government violated Title III minimization requirements. It is important that the Defendants have access to the training records as these will show what steps were taken and whether or not the Government flagrantly disregarded Title III's minimization requirements. Federal

courts "asked to determine whether agents have complied with the minimization requirement have 'looked to whether the agents devised a reasonable means of limiting interception, and whether they utilized the safeguards in good faith.'" *King*, 991 F. Supp. at 90 (quoting *Hinton*, 543 F.2d at 1012).    Minimization instructions are relevant.  *See King*, 991 F. Supp. at 91 (citing *Rizzo*, 491 F.2d at 217). According to the *King* court, to determine "compliance with Section 2518(5) . . . [courts consider] whether the monitoring personnel are provided with minimization instructions."  991 F. Supp. at 91.

Third, minimization training records are directly relevant to whether or not the Government complied with Title III requirements because they constitute a part of the prima facie case the Government must make to show proper minimization. *See Orozco*, 630 F. Supp. 1418, 1537 (S.D. Cal. 1986) (describing the components of the Government's prima facie case).  A prima facie case that the Government complied with Title III minimization requirements would include, *inter alia*, the following:

- affidavits by agents "describ[ing] the minimization briefings conducted by [an Assistant United States Attorney],"

- the agents' daily review of the  "contemporaneous logs made of the monitored conversations,"

- "a chart listing the number of calls that were either minimized in under two minutes or were too short to minimize, the number of calls minimized after two minutes and the number of 'pertinent' calls,"

- an affidavit "thorough[ly] descri[bing] the agents' operation of the monitoring equipment during interception, minimization, and periodic spot-checks, and the bases for characterizing calls as 'pertinent,'"

- an affidavit "describ[ing] the pattern of usage for some of the intercepted telephone lines and the conversation habits of frequent users of those lines,"

- a "memorandum from [an] Assistant United States Attorney . . . to agents participating in the electronic surveillance . . . provid[ing] general guidelines and instructions for interception and minimization,"

- an affidavit from a special agent "outlining the briefing conducted by the Assistant United States Attorney . . . prior to the [wiretap],"

- "the written instructions provided to the agents [who conducted the wiretap],"

- a special agent's "affidavit outlining the verbal and written instructions given to . . . FBI agents regarding minimization," and

- "the written instructions given to each monitoring agent."

*Orozco*, 630 F. Supp. at 1537.  The court in *Orozco* found that these affidavits and materials "established a prima facie case that the agents conducted reasonable minimization."  *Id.* at 1538.

Although the Defendants have not asked for affidavits such as those in *Orozco*, they are entitled to the information described in the affidavits provided in *Orozco*.  As the cases cited above show, the training and instructions given to the monitors is directly relevant to whether or not the Government complied with Title III minimization requirements.

**I.      Category 17: Reports of wiretap applications.**

The Defendants are entitled to the documents and materials described in Category 17 for one reason.  *See* Doc. 573 at 9 (describing documents and materials described in category 17).

It is relevant to the question of proper minimization.  Title III requires the Administrative Office of the United States Courts (AO) to report to Congress "the number and nature of federal and state applications for orders authorizing or approving the interception of wire, oral, or telephonic communications."  Report of the Director of the Administrative Office of the United States Courts on Applications for Orders Authorizing or Approving the Interception of Wire, Oral, or Electronic Communications at 5 (April 2005).  The AO receives reports from United States Attorneys' offices nationwide regarding wiretaps.  These reports show the percentage of intercepted communications that were incriminating, the number of

persons whose communications were intercepted, and other pertinent information. *See id.* This information is directly relevant to the determination whether the Government complied with Title III minimization requirements, *see Suquet*, 547 F. Supp. at 1036, insofar as it shows the percentage of calls that were incriminating, and the number of persons whose conversations were intercepted.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court grant the discovery motion with respect to the categories discussed in this reply. In the alternative, the Defendants respectfully request the Court to reconsider its partial denial of the discovery motion with respect to the categories discussed herein.

Respectfully submitted,

Electronically filed
Scott M. Davidson, Ph.D., Esq.
1011 Lomas Boulevard NW
Albuquerque, NM 87102
(505) 255-9084
Associate Counsel for Defendants
   represented by CJA counsel

23

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of November, 2006, I served a true and correct copy of this pleading to by U.S. mail, postage prepaid, on counsel for the United States at the address listed below:

James R.W. Braun, Esq.
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico  87102

<u>Electronically filed</u>
Scott M. Davidson, Ph.D., Esq.