```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW MEXICO
 2

 3

 4

 5   UNITED STATES OF AMERICA

 6                         Plaintiff,

 7    -vs-                      NO:  CR 05-1849 JH

 8   DAVID REID, GEORGE OSGOOD,
     GREG HILL, DENNIS WILSON, et al.,
 9
                          Defendants.
10

11

12

13

14

15              TRANSCRIPT OF PROCEEDINGS

16                   James Hearing

17                   April 1, 2009

18

19

20

21

22

23

24   BEFORE:  HONORABLE JUDITH C. HERRERA
                UNITED STATES DISTRICT JUDGE
25
```

**PAUL BACA, OFFICIAL COURT REPORTER**

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 2

```
 1                     APPEARANCES

 2   For the Plaintiff:

 3        US ATTORNEY'S OFFICE
          PO Box 607
 4        Albuquerque, NM  87103-0607
          575-346-7274
 5        BY:   JAMES W.R. BRAUN,
                james.braun@usdoj.com
 6              STEPHEN R. KOTZ, ESQ.
                steve.kotz@usdoj.gov
 7
     For Defendant Greg Hill:
 8
          BILLY R. BLACKBURN, ESQ.
 9        1011 Lomas Blvd., NW
          Albuquerque, NM  87102
10        505-242-1600
          Billy@BBlackburnlaw.com
11
          PAUL LINNENBURGER, ESQ.
12        1011 Lomas Blvd., NW
          Albuquerque, NM  87102
13        505-242-1600
          paul@lomaslaw.com
14
     For Defendant Dennis Wilson:
15
          GORENCE & OLIVEROS, PC
16        201 12th Street, NW
          Albuquerque, NM  87102
17        505-244-0888
          BY:   ROBERT J. GORENCE, ESQ.
18              gorence@swcd.com

19   For Defendant George Osgood:

20        LAW OFFICE OF AMY SIRIGNANO,PC
          1011 Lomas Boulevard NW
21        Albuquerque, NM 87102
          505-242-2770
22        amy@abqnmlaw.com

23        SCOTT MORAN DAVIDSON, ESQ.
          1011 Lomas Blvd., NW
24        Albuquerque, NM  87102
          505-255-9084
25        scott@smdappellatelaw.com
```

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 3

1        Defendants Greg Hill and George Osgood appeared
     in person.
2

3

4                          INDEX                      PAGE

5    RICH STARK

6    Direct Examination By Mr. Braun                   17
     Cross-Examination by Mr. Nash                     42
7    Cross-Examination by Mr. Blackburn                63
     Cross-Examination by Ms. Sirignano                77
8    Further Cross-Examination by Mr. Nash            113

9    Reporter's Certificate                           118

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 4

```
 1              (Court in session at 9:37 a.m.)

 2              THE COURT:  Please be seated.  Good

 3     morning.  We are on the record in USA vs Reid,

 4     Osgood, Hill and Wilson.  That's CR-05-1849.  Good

 5     morning.

 6              MR. BRAUN:  Good morning, Your Honor.

 7     James Braun and Steve Kotz on behalf of the United

 8     States, along with DEA Special Agent Rich Stark and

 9     Diana Contreras, who is a paralegal in our office.

10              MR. NASH:  Good morning, Your Honor.

11     Walter Nash appearing on behalf of David Reid.  With

12     the Court's advance permission, Mr. Reid is not

13     present, and I will waive his appearance at this

14     hearing.

15              THE COURT:  Thank you.

16              MS. SIRIGNANO:  Good morning, Your Honor.

17     Amy Sirignano on behalf of Mr. Osgood, who is

18     present and in custody today.

19              MR. DAVIDSON:  Your Honor, Scott Davidson

20     also on behalf of Mr. Osgood.

21              MR. GORENCE:  Good morning, Your Honor.

22     Robert Gorence on behalf of Dennis Wilson.  And I

23     have waived and the Court has waived his presence.

24              THE COURT:  Thank you, Mr. Gorence.

25              MR. BLACKBURN:  Good morning, Your Honor.
```

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 5

1   Billy Blackburn and Paul Linnenburger on behalf of

2   Greg Hill, who is present, Your Honor.

3           THE COURT:  All right.  We're here this

4   morning on our James hearing.  Let me mention the

5   only scheduling twist we have today is I have

6   another matter I need to attend to at about 11:30.

7   So we'll break around 11:30 in this matter.

8           And I have no other matters that I need to

9   attend to, other than that one.  So any time spent

10  this afternoon is all yours.

11          Mr. Gorence, do you have something to say?

12          MR. GORENCE:  I do.  Preliminary, Your

13  Honor, the government and Mr. Wilson have reached an

14  agreement to resolve this case.  I anticipate a plea

15  actually being taken as we finish the paperwork next

16  week.

17          Given that, I would withdraw the James

18  motion filed on behalf of Mr. Wilson and ask to be

19  excused.

20          THE COURT:  All right.  Any comment?

21          MR. BRAUN:  That is accurate.  We have

22  reached an agreement, and we have no objection to

23  withdrawal of the motion.

24          THE COURT:  All right.  Well, I note that

25  your objection -- or that your motion is withdrawn,

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 6

1    and you may be excused.

2             MR. GORENCE:  Thank you, Your Honor.

3             THE COURT:  Thank you, Mr. Gorence.

4             Are we ready to proceed?

5             MR. BRAUN:  Yes, Your Honor.  I'm not sure

6    if the Court wanted to talk about how we're going to

7    proceed first.

8             THE COURT:  All right.

9             MR. BRAUN:  I think the United States'

10   position is clearly stated in its memorandum

11   regarding the James hearing that was filed in late

12   December.  And then Mr. Nash, on behalf of Defendant

13   Reid, filed his memorandum on March 30th.

14            And I think the parties are in agreement

15   about how we're going to proceed this morning, which

16   is just that the United States will put on the

17   summary testimony of Special Agent Rich Stark to

18   establish the foundational predicate that a

19   conspiracy did exist and that these defendants were

20   members of that conspiracy.

21            And then we can deal with the

22   admissibility of specific statements either at trial

23   or closer to trial.

24            THE COURT:  All right.  Is there any

25   comment on that?

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 7

1          MR. BLACKBURN:  If I may, Your Honor,

2    Billy Blackburn on behalf of Mr. Hill.

3          THE COURT:  Yes, Mr. Blackburn.

4          MR. BLACKBURN:  I guess while I was out of

5    town there were some communications -- I was out of

6    town last week -- some communications about the

7    procedures for this hearing today.

8          I agree with the initial memorandum that

9    was filed on behalf of Mr. Hill and the predicate

10   cases that was initially supplied by Mr. Hill.  And

11   the government outlines, you know, obviously all of

12   the cases running from James and Owens and Anderson

13   and Bourjaily and how the matter should be

14   conducted.

15         I was under the assumption -- but I agreed

16   with counsel and with Mr. Braun this morning.  I

17   thought we with going to do the whole -- I guess,

18   with all due respect, the whole enchilada; that we

19   would establish the conspiracy, which is one, and

20   then the determination of each and every

21   co-conspirator hearsay statement that would be

22   introduced if the matter was to go to trial.

23         However, I have no objection to basically

24   doing the establishment of the conspiracy as

25   Mr. Braun has outlined today, as long as prior to

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

1    trial -- and I can understand the dynamics of that.

2         Because obviously, as we continue to get

3    de facto severances as each new defendant or as each

4    defendant sort of drops out as we get ready to go to

5    trial, assuming that there was going to be a trial

6    amongst those individuals, different co-conspirator

7    hearsay statements would be effective because that

8    person may testify, for one.  Or the government

9    would pare its case down, obviously, as to those

10   individuals.

11        And therefore, what we would maybe do

12   today, if we're going to do 250 or 260 statements,

13   may not be what the government would do, you know,

14   if we're going to go to trial on this case, which is

15   two or three or maybe one defendant, under the

16   circumstances.

17        And not knowing what each of the

18   cooperating witnesses would say specifically as to

19   each co-conspirator hearsay statement may be

20   addressed prior to trial, as opposed to today.  And

21   I agree with that method.

22        I just want to let the Court know that as

23   long as -- of course, depending upon who stands at

24   trial.  But if we know that there's only going to be

25   one or two at trial, my purpose would be obviously

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 9

```
 1    not to have us drudge through each and every
 2    co-conspirator hearsay statement during trial, but
 3    to have some type of like second preview for the
 4    Court to rule on shortly before trial.  So I just
 5    wanted to make that for the record.
 6              But I understand the process we're doing
 7    today.  And I think, with all due respect, it's
 8    probably the most efficient.
 9              THE COURT:  All right.
10              MR. BLACKBURN:  Does that make sense?
11              THE COURT:  I think it makes sense, so
12    that's the way we'll proceed.  And if, of course,
13    there are any specific issues that you would like to
14    address at pretrial, I'll expect you to file
15    something to alert the Court to that.
16              Yes, Ms. Sirignano.
17              MS. SIRIGNANO:  Your Honor, if I may for
18    just a moment, I just need to get some clarification
19    on exactly what we're doing.  And I must apologize
20    because I've recently come on this case, and I
21    haven't really had an opportunity to go through the
22    entire 80,000 pages of discovery or the 10,000 phone
23    calls.  So I'm really trying to just narrow my focus
24    to what the evidence is against Mr. Osgood.
25              And so I just need to have some
```

**PAUL BACA, OFFICIAL COURT REPORTER**

1   familiarity on how we're going to do this today.

2           Are you planning on presenting specific

3   statements against Mr. Osgood today?

4           MR. BRAUN:  No.  Essentially what I'm

5   going to do, Your Honor, is just have Agent Stark

6   testify summarily about the his investigation, his

7   interview of certain cooperating defendant witnesses

8   and what those cooperating defendant witnesses would

9   say were their specific dealings with some of these

10  defendants, their first-hand observations of those

11  defendants.

12          There may be a few co-conspirator

13  statements sprinkled in there, but the bulk of the

14  evidence is independent of co-conspirator

15  statements.

16          MS. SIRIGNANO:  Okay.  And with that

17  knowledge, Judge, I just wanted to make a record

18  here.  And I'm doing this -- I haven't had an

19  opportunity to prepare a motion or to research any

20  case law.

21          I was provided with a CW statement last

22  night at 4:00 which is very damning against my

23  client.  And Mr. Braun and I talked yesterday.  And

24  I assume that Agent Stark is going to testify about

25  this statement today because he provided it to me,

**PAUL BACA, OFFICIAL COURT REPORTER**

1    he said, as early Jenks.  Okay?

2         And so I can hold this objection until the

3    time comes when Agent Starks testifies, or I can

4    raise my objection with the Court now as to whether

5    or not it's Jenks, whether or not it's Rule 16.

6         I believe there's other statements out

7    there that could be possibly Brady statements,

8    exculpatory statements that the government has not

9    turned over that could be exculpatory to my client.

10   And so I just wanted to lay a record and a

11   foundation.  And I can always revisit this down the

12   road, once Agent Starks testifies.

13        THE COURT:  All right.  Any comment?

14        MR. BRAUN:  Your Honor, yes, I would like

15   to comment on this.

16        Essentially during the course of the

17   investigation into Defendant Osgood's whereabouts --

18   you know, he was a fugitive for several years after

19   the indictment in this case -- the Marshals came

20   across a witness named J.D. LaMonte who was in

21   custody in New York.  They interviewed him regarding

22   his knowledge of Osgood and his whereabouts.

23        He told them that Osgood might be using a

24   false name, the name, I think, James Deiner.  They

25   subsequently did find the defendant Osgood using

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 12

1    that name.

2         Subsequently, Agent Stark and I went out

3    and interviewed this witness in early February.

4    Agent Stark prepared a report of that interview,

5    which is not subject to discovery.  Rule 16

6    specifically excludes agent reports as discovery.

7    And to the extent that it is a statement of Agent

8    Stark, it would be Jenks Act after he testified at

9    trial.

10         Now, I received that report from Agent

11   Stark about ten days ago, the Friday before last.

12   And as a courtesy, I provided it to the defense last

13   night so she would have it in advance of this

14   hearing.  The Jenks Act requires disclosure after a

15   witness testifies at trial.

16         Rule 26.2 extends the Jenks Act to other

17   types of hearings and specifically lists suppression

18   hearings, sentencings and other types of hearings.

19   It does not list a James hearing, so it's not even

20   Jenks Act as to this hearing.  It's provided only as

21   a courtesy.

22         There is no basis for an objection.  This

23   is evidence that we will use at trial.  This hearing

24   today is simply evidentiary.  It's not a substantive

25   hearing.  It's simply to establish an evidentiary

1    predicate to the introduction of co-conspirator

2    statements.

3            There's no basis for an objection to the

4    introduction of testimony about this potential

5    testimony today.

6            THE COURT:  All right.  Thank you,

7    Mr. Braun.

8            MS. SIRIGNANO:  And Your Honor, if I may,

9    Assistant United States Attorney James Braun did

10   just state that we will use this at trial.  And

11   Rule 16 clearly provides -- 16(e)(1) -- that upon

12   the defendant's request, the government must permit

13   the defendant to inspect documents that the

14   government intends to use in its case in chief at

15   trial.

16           And I really do need to do a motion and

17   brief this for the Court.  Mr. Braun is entitled to

18   his position that this is solely Jenks and it is not

19   discoverable under Rule 16(g)(2).

20           But the defense' position is that this is

21   something they're going to use at trial.  This is an

22   item that's material in preparing the defense.  And

23   these late disclosures -- he's known for months now

24   that we've had this hearing set, and the interview

25   happened in February.  And I was told about this

1    statement when I saw Mr. Braun and Agent Stark in

2    the US Attorney's office nearly three weeks ago.

3           And so I just want to lay a record that

4    he's entitled to his opinion that it's just simply

5    Jenks.  I believe it's more than Jenks.  I believe

6    it's possibly Brady and Rule 16.

7           And I think there's other reports other

8    than this one that the government is withholding

9    from not just me, but other defendants; that they're

10   taking the position that they're simply Jenks

11   material.  But I believe that they're discoverable

12   under Rule 16 and Brady.  I just would like to lay

13   my record and have leave to file a motion with the

14   Court, Your Honor.

15           THE COURT:  Mr. Braun.

16           MR. BRAUN:  And Your Honor, I would just

17   note that even if it was Rule 16, which defense

18   counsel is ignoring Rule 16(a)(2), which

19   specifically excludes agent reports.  But even if it

20   was, it has been produced well in advance of trial.

21   There's not even a trial date yet, so there would be

22   no prejudice.

23           But be that as it may, we're here just for

24   this hearing, and I don't think there is any basis

25   to exclude it from this hearing.

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 15

```
 1              THE COURT:  All right.  Well, your
 2    comments have been noted for the record.  I didn't
 3    understand that you were formally making an
 4    objection at this point.  If you're making an
 5    objection at this point, your objection is
 6    overruled.
 7              MS. SIRIGNANO:  Thank you, Your Honor.
 8              THE COURT:  All right.  Are we ready to
 9    proceed?
10              MR. NASH:  If I may, Your Honor.
11              THE COURT:  Yes.
12              MR. NASH:  One minor housekeeping matter
13    that I think the parties are all in agreement on.
14    We noted on the calendar that there is a hearing
15    date set on April 28th that is a vestige of some
16    prior schedules and calendars that the Court had
17    set, all of which have been kind of rendered moot by
18    this new sequence.
19              Our understanding is that -- I believe
20    it's the 1st of May -- Defendant Osgood and other
21    counsel may supplement the wiretap motion.  The
22    government has a scheduled time to respond, and we
23    have a scheduled time to reply.
24              Once that matter is at issue, we will then
25    find a good hearing date to litigate whether we get
```

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 16

1    a Franks hearing.  Then after that decision is made,

2    we would set a hearing on the main wiretap issue.

3            Subsequent thereto, we would set a hearing

4    on whatever other motions remain in advance of

5    trial, in view of the defendants who remain, and set

6    a trial date.

7            I think we're all in agreement that the

8    date of the 28th should be vacated.  And again, it's

9    a product of some prior schedules.

10           THE COURT:  Any disagreement with that?

11           MR. BRAUN:  That is correct, Your Honor.

12           MR. BLACKBURN:  No, Your Honor.

13           THE COURT:  All right.  We were thinking

14   that that would probably be the case, but I wanted

15   to hear it from you all before I vacated it.  So we

16   will vacate that April 28th hearing, and we'll set

17   another hearing date at the appropriate time.  All

18   right?

19           Are we ready to proceed?

20           MR. BRAUN:  Yes, Your Honor.  The

21   government calls DEA Special Agent Rich Stark.

22           THE COURT:  Please come forward.

23

24

25

**PAUL BACA, OFFICIAL COURT REPORTER**

1                    RICH STARK,

2    having been first duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4    BY MR. BRAUN:

5        Q.    Please state your name.

6        A.    Rich Stark.

7        Q.    You might want to pull the microphone a

8    little closer to you.  How are you employed?

9        A.    I'm employed as a Special Agent with the

10   Drug Enforcement Administration in Albuquerque, New

11   Mexico.

12       Q.    How long have you been a DEA Special

13   Agent?

14       A.    Since 1996.

15       Q.    And what is your role in this case?

16       A.    I'm the assigned case agent to investigate

17   the Dana Jarvis drug trafficking organization.

18       Q.    And when did you begin your investigation

19   in this case?

20       A.    In 2002.

21       Q.    Did your investigation ultimately include

22   the use of court-authorized wiretaps on numerous

23   telephones related to the Jarvis organization?

24       A.    Yes, it did.

25       Q.    And those wiretaps span from March of 2005

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 18

1    until August of 2005?

2        A.    That is correct.

3        Q.    And the federal grand jury returned the

4    initial indictment in this case on August 23rd,

5    2005?

6        A.    That is correct.

7        Q.    As the case agent in this case, have you

8    conducted interviews of certain cooperating

9    defendant witnesses?

10       A.    Yes, I have.

11       Q.    Let start with Barbara Hanna.  Has she

12   pled guilty to her participation in the money

13   laundering conspiracy charged in Count 36 of the

14   indictment?

15       A.    She has.

16       Q.    And has she agreed to testify in this

17   case?

18       A.    Yes, she has.

19       Q.    Based on your interview of Ms. Hanna, what

20   would she testify to regarding how she got involved

21   in the Jarvis drug trafficking organization and what

22   her role was in the organization?

23       A.    Ms. Hanna would testify that in

24   approximately 1990, she was working as a call girl

25   at an escort service in Boston, Massachusetts.  She

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 19

1    was hired for the evening by Mr. Jarvis.

2            During that first encounter, Mr. Jarvis

3    told Barbara Hanna that he was a marijuana drug

4    trafficker and was in Boston doing quote, unquote,

5    business.  After that, they struck up a

6    relationship.

7            Mr. Jarvis trusted her immediately with

8    bulk cash.  And she was asked to store bulk cash in

9    her studio apartment in Boston, and she also became

10   a courier of bulk US currency for Mr. Jarvis.

11       Q.    Okay.  And a few months after meeting

12   Jarvis in 1990, did she move to New Mexico at his

13   request?

14       A.    Yes, she did.

15       Q.    And what was her role in the investigation

16   at that point?

17       A.    In the early days, she was a courier.  She

18   brought bulk US currency back to Mr. Jarvis from New

19   York, Bloomington and other destinations.

20       Q.    And are you aware of a seizure of

21   approximately $25,000 from Ms. Hanna at the

22   Dallas/Fort Worth airport on February 5th, 1992?

23       A.    Yes, I am.

24       Q.    Could you please tell the Court about that

25   incident?

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

1      A.    On that date, Ms. Hanna was flying under

2    the name of Ann Hayes.  The DEA interdiction group

3    based at the Dallas/Fort Worth International Airport

4    encountered her.  During the encounter, they

5    discovered $25,000 in bulk US currency, I believe,

6    in her purse.

7      Q.    Okay.  And what would her testimony be

8    regarding that seizure?

9      A.    She stated that she was transporting bulk

10   cash for Mr. Jarvis.

11     Q.    After the return of the indictment in this

12   case, the initial indictment on August 23rd, 2005,

13   did agents execute a search warrant at Ms. Hanna's

14   residence on August 25th, 2005?

15     A.    Yes, they did.

16     Q.    What did they find there?

17     A.    They found bulk cash in the amount of

18   approximately $47,000, I believe, and a very large

19   pile of rubber bands.

20     Q.    And what is the significance of the rubber

21   bands?

22     A.    The rubber bands were used to band $5,000

23   bundles of currency for the Jarvis organization.

24     Q.    Okay.  And the presence of those rubber

25   bands, did they corroborate Ms. Hanna's testimony

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 21

1    about what her role was later in the conspiracy?

2        A.    Yes, they do.

3        Q.    And what would she testify was her role

4    later in the conspiracy, say after 2001 or 2002?

5        A.    She stated that she was the individual

6    that the money was brought back to.  And she was

7    responsible for counting the money, inventorying it,

8    repackaging it and then passing it on to other

9    individuals within the Jarvis drug organization.

10       Q.    And what would she testify that money was

11   the proceeds of?

12       A.    It was the proceeds of drug trafficking,

13   specifically the distribution of bulk marijuana.

14       Q.    Okay.  And where would she say that money

15   was taken after she had counted it and packaged it?

16       A.    It was transferred to Mr. Jarvis and also

17   to a man in Tucson, Arizona, by the name of Mike

18   Hannah, who held those drug proceeds.

19       Q.    Okay.  And did agents execute a search

20   warrant on a safety deposit box belonging to

21   Ms. Hanna?

22       A.    Yes, they did.

23       Q.    What was found in the safety deposit box?

24       A.    Agents discovered $100,000, approximately

25   $100,000, in US currency inside the safety deposit

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 22

```
 1   box.
 2       Q.    Okay.  Now you mentioned Mike Hannah.  Is
 3   he also a cooperating defendant witness in this
 4   case?
 5       A.    Yes, sir, he is.
 6       Q.    And he has pled guilty to Counts 1 and 3
 7   of the indictment in this case?
 8       A.    Yes, sir, he has.
 9       Q.    Okay.  Based on your interview of Mike
10   Hannah, what would he testify to regarding how he
11   got involved in the Jarvis drug trafficking
12   organization and what his role was?
13       A.    He would testify that I believe it was in
14   either 1992 or '94, Mr. Hannah began holding bulk US
15   currency that was the proceeds of drug trafficking
16   for Mr. Jarvis.  He would hold that bulk cash until
17   Mr. Jarvis gave him authorization to release that
18   cash to sources of supply for marijuana in the state
19   of Arizona or other associates tied to Mr. Jarvis.
20       Q.    Okay.  When he was interviewed, he said
21   that the first time he held money for Mr. Jarvis was
22   about 15 years ago; is that right?
23       A.    That is correct.
24       Q.    And that interview occurred in 2005?
25       A.    That is correct.
```

**PAUL BACA, OFFICIAL COURT REPORTER**

1    Q.    Did you intercept calls during the course

2    of the wiretaps that corroborate Mr. Hannah's

3    testimony regarding his role in the organization?

4    A.    Yes, we did.

5    Q.    Specifically, if you could tell the Court

6    about a series of phone calls between Ayla Jarvis

7    and Mike Hannah and between Ayla Jarvis and Dana

8    Jarvis on June 26, 2005.

9    A.    In the intercepted phone conversations

10   between Ayla Jarvis and Mike Hannah, Ayla was

11   attempting to have Mr. Hannah release a sum of

12   money -- I believe it was $108,000 -- so she could

13   pay individuals that she had procured bulk marijuana

14   from for the organization.

15          She tried several times to have Mr. Hannah

16   release the funds to her, and Mr. Hannah stated he

17   could not release the funds without authorization.

18          Later there was a conversation between

19   Dana Jarvis and Ayla Jarvis where Mr. Jarvis was

20   furious with Ayla for trying to have Mike release

21   the funds to her.  And he basically stated, "I'm the

22   only one that's authorized to give that

23   authorization to Mr. Hannah."  And he said, "I'm not

24   releasing a dime without the net list," which was

25   the net weights of the bulk marijuana that she was

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 24

1    trying to procure.

2        Q.    Okay.  And just to clarify, Mike Hannah

3    and Barbara Hanna are not related; is that right?

4        A.    No, sir, they are not.

5        Q.    Now prior to initiating the wiretaps in

6    this case, did you participate in the seizure of

7    approximately $287,000 from Ayla Jarvis in

8    Bloomington, Indiana, on October 28, 2004?

9        A.    Yes, I did.

10        Q.    Could the tell the Court about that money

11    seizure?

12        A.    On the day before that date, we had

13    determined that Dana Jarvis owned an aircraft.  The

14    tail number of the aircraft was N, as in November,

15    three Alpha Juliette.  We placed a lookout with the

16    Air Marine Operation Center in Riverside,

17    California.

18            And on the day before the stated date, we

19    were notified by AMEC that the aircraft was leaving

20    Tucson, Arizona, en route to Oklahoma City.  I was

21    able to board a United States Customs aircraft, and

22    I and two other agents followed November three Alpha

23    Juliette to Oklahoma City and were able to land

24    actually just a few minutes in front of them.

25            Once November three Alpha Juliette landed,

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 25

```
 1    I observed Ayla Jarvis exit the aircraft as well as

 2    the pilot, David Reid.  Surveillance units that we

 3    had requested from Oklahoma City helped us place

 4    Ms. Jarvis and Mr. Reid at a local hotel that

 5    evening.

 6              The next morning, we were notified by AMEC

 7    again that the aircraft was departing Oklahoma City

 8    en route to Bloomington, Indiana.  I contacted DEA

 9    agents at the Indianapolis DEA office, who then

10    established surveillance at the Bloomington,

11    Indiana, airport.

12              The aircraft arrived.  Ayla Jarvis was

13    observed exiting the aircraft, getting in a van and

14    driving to a local restaurant -- I believe it was a

15    Cracker Barrel -- in Bloomington, Indiana.  Agents

16    observed her walk in.  And a short time thereafter,

17    she walked out with a man identified as Greg Hill.

18              And following that meeting, Ayla Jarvis

19    made an illegal U-turn in front of a police officer,

20    and a car stop was performed.  And subsequent to

21    that car stop, agents discovered approximately

22    $287,000 in bulk US currency.

23    Q.    Okay.  Was that money seized?

24    A.    Yes, it was.

25    Q.    What did Ayla Jarvis say about that money
```

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 26

1    at the time of the stop?

2        A.    At the time of the stop, she told the

3    officer that that money belonged to her father and

4    that it was for the purchase of an aircraft or some

5    real estate and that her father did not believe in

6    banks.

7        Q.    Okay.  What happened after that?

8        A.    The money was seized, and Ms. Jarvis was

9    allowed to leave.

10        Q.    Okay.  Has Ayla Jarvis pled guilty to her

11    involvement in the Jarvis drug trafficking

12    organization and the money laundering conspiracy?

13        A.    Yes, she has.

14        Q.    And she has agreed to testify in this

15    case?

16        A.    Yes, she has.

17        Q.    Based on your interviews with Ms. Jarvis,

18    what would she testify to regarding her role in the

19    Jarvis organization?

20        A.    Ayla Jarvis would testify that she did

21    lots of little errands for her father throughout the

22    years.  But when she was 16 years old, she began

23    stripping and weighing the bulk marijuana in Tucson

24    and preparing it for transport.

25        Q.    Okay.  What else did she do?

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 27

1      A.    She transported bulk cash, and then she

2    also procured bulk marijuana from other sources of

3    supply for the organization.

4      Q.    What would she testify to specifically

5    regarding the October 28th, 2004, money seizure?

6      A.    She stated that that was the first time

7    that she was sent to pick up bulk cash for the

8    organization and that that was the first time that

9    the aircraft was used to pick up bulk cash for the

10   organization.

11     Q.    And would she testify about statements

12   made by Defendant Reid after the seizure of the

13   marijuana?

14     A.    Yes, she would.

15     Q.    Could you describe that for the Court?

16     A.    Yes.  She stated that she went back to the

17   airport and told Mr. Reid, the pilot, what happened.

18   Then Mr. Reid called Mr. Jarvis, and she heard him

19   talk to Mr. Jarvis.  And Mr. Reid asked, "This

20   doesn't have anything to do with drugs, does it,"

21   something to that effect.  To which Mr. Jarvis

22   replied, "No, it does not."

23     Q.    And what happened then?

24     A.    And then she stated that Mr. Reid

25   contacted the trooper that was responsible for

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 28

1    seizing the bulk cash.

2        Q.    And what would the trooper testify to

3    regarding his conversation with David Reid?

4        A.    Trooper Staley, in his report, stated that

5    he received a call from David Reid, trying to get a

6    hold of him.  He got a message then to call Mr. Reid

7    back.  He called Mr. Reid.

8            Mr. Reid claimed that the money was his

9    and that it was for the purchase of an aircraft, and

10   he could provide the trooper proof that they planned

11   to buy an aircraft.

12           And then he the trooper stated, "Well,

13   it's being forfeited," and the trooper explained

14   that he had provided a receipt to his daughter.

15       Q.    His daughter, meaning Ayla Jarvis?

16       A.    That's correct.

17       Q.    Okay.  And was there a second call the

18   next day between David Reid and the trooper?

19       A.    That's correct.  Mr. Reid contacted -- I

20   believe there was a message, and the trooper called

21   back and spoke with Mr. Reid.  And Mr. Reid stated

22   that he had spoken to an attorney and that he was

23   willing to enter into a quote, unquote, compromising

24   agreement where he returned $25,000 and the trooper

25   could keep $25,000 of that bulk cash for a trooper

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 29

1    fund if they would return the remaining bulk US

2    currency to Mr. Reid.

3        Q.    Okay.  And would the trooper testify that

4    David Reid said, "This is not a bribe"?

5        A.    That is correct.

6        Q.    Would Ayla Jarvis testify about a

7    subsequent encounter with David Reid involving bulk

8    currency?

9        A.    Yes.  Yes, she would.

10        Q.    Okay.  Could you describe that for the

11    Court involving a duffle bag?

12        A.    Yes.  Several months later, Ms. Jarvis

13    said that she was at the Lazy B.  The address was

14    the Lazy B stash trailer.  It was a trailer used to

15    reroute the marijuana, the bulk marijuana.

16        Q.    In Tucson?

17        A.    In Tucson, Arizona.  Mr. Reid arrived at

18    the stash trailer location carrying a duffle bag

19    with bulk US currency in it, approximately $80,000.

20    He stated that it was from George Ripley.

21              And when he gave it to her, he made a

22    statement that if your bag smelled anything like

23    this bag, no wonder it got seized.  And Ms. Jarvis

24    stated the bag reeked of marijuana.

25              And she said, as a matter of fact,

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

1  following that incident, that she contacted George

2  Ripley and told him not to transport bulk US

3  currency in bags that smelled like marijuana.  They

4  would have to change how they packaged the cash.

5      Q.    Okay.  And subsequent to his arrest in

6  this case, did Defendant Reid make a statement to

7  agents after waiving his Miranda rights?

8      A.    Yes, sir, he did.

9      Q.    And what did he say about how he met Dana

10  Jarvis and what his work for Jarvis was?

11     A.    I believe that he stated that Mr. Jarvis

12  purchased November three Alpha Juliette in July of

13  2004 and that Mr. Jarvis procured his services as a

14  pilot through -- I believe, the name was Falcon

15  Executive Aviation, something like that.

16     Q.    Okay.  So Defendant Reid admitted that he

17  was a pilot for Defendant Jarvis?

18     A.    That is correct.

19     Q.    But he did not admit that he knew he was

20  transporting marijuana or bulk currency that was the

21  proceeds of drug trafficking?

22     A.    That is correct.

23     Q.    Are there cooperating defendant witnesses

24  who will testify about bulk marijuana being

25  transported by plane with David Reid as the pilot?

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 31

1        A.    Yes.

2        Q.    Is one of those witnesses Salvador Abeyta?

3        A.    Yes.

4        Q.    Has he pled guilty to his participation in

5    the drug trafficking organization charge in this

6    case?

7        A.    Yes, he has.

8        Q.    And he's agreed to testify?

9        A.    Yes, he has.

10       Q.    What would he testify to regarding what

11   I've asked you about, the transporting of marijuana

12   on the plane?

13       A.    Salvador Abeyta provided statements.  And

14   he said that in the summer of 2005, he went to visit

15   Dana Jarvis in Tucson, Arizona.  He wound up driving

16   Mr. Jarvis around Tucson on various errands, and

17   then he went to the Lazy B stash house/trailer.

18             When he entered the trailer, an individual

19   by the name of Sam Jones and Adrian Sanford were

20   wrapping bulk marijuana and placing that marijuana

21   inside of suitcases.  Mr. Abeyta said that later

22   that evening, the suitcases were loaded into his

23   vehicle and then driven to an airport on the

24   outskirts of Tucson and that luggage with the bulk

25   marijuana was loaded aboard the aircraft.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 32

1     Q.    Okay.  Will Salvador Abeyta testify about

2  Mr. Reid's demeanor?

3     A.    Yes.  He stated that Mr. Reid was very

4  nervous and was looking around and concerned that

5  Mr. Abeyta had been followed to the airport.

6     Q.    Okay.  Now you mentioned Sam Jones.  Is he

7  another cooperating defendant witness?

8     A.    Yes, he is.

9     Q.    And he's pled guilty in this case as well?

10    A.    Yes, he has.

11    Q.    And he's agreed to testify?

12    A.    That is correct.

13    Q.    Based on your interview of Mr. Jones, what

14 would he testify to regarding marijuana being

15 transported by plane?

16    A.    Mr. Jones stated that he indeed did wrap

17 marijuana and place bulk marijuana inside of

18 suitcases, and those suitcases were transported in

19 Salvador Abeyta's vehicle to an airport outside of

20 Tucson.  He helped load those bags aboard the

21 aircraft, and that aircraft was then flown to

22 Albuquerque.

23         The bulk marijuana that was inside the

24 suitcases was left on board the aircraft that

25 evening, except for one small bundle that was taken

**PAUL BACA, OFFICIAL COURT REPORTER**

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

1    to a house owned by Mr. Jarvis in Bernalillo, New

2    Mexico.  And that's where everybody spent the night.

3        Q.    Okay.  Now based on your investigation,

4    how was marijuana generally transported by the

5    Jarvis organization?

6        A.    The primary way that the marijuana was

7    packaged and transported for this organization was

8    the bulk marijuana was placed inside dark-colored

9    duffle bags and then placed in vehicles and

10   transported by vehicle.

11       Q.    Okay.  So will Mr. Jones testify about his

12   understanding of why this marijuana was placed into

13   suitcases for being flown on the plane?

14       A.    Yes, he would.

15       Q.    What would he say about that?

16       A.    He said that he spoke with Mr. Jarvis.

17   And Mr. Jarvis said quote, unquote, we have a

18   request to place the items in suitcases, pretty

19   much.  And it was Mr. Jones' understanding that that

20   request could have only come from one person, and

21   that was the pilot, David Reid.

22       Q.    Okay.  During the course of the wiretap

23   interceptions, did you intercept calls that would

24   corroborate this load of marijuana that Sam Jones

25   and Salvador Abeyta will testify about?

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 34

1      A.    Yes.

2      Q.    And specifically, did you intercept a call

3  where Dana Jarvis asked Sam Jones to come to Tucson

4  on June 28, 2005?

5      A.    Yes.  We intercepted a call where he asked

6  Mr. Jones to come to Tucson right away.

7      Q.    Okay.  Would Ayla Jarvis also testify

8  about this incident?

9      A.    Yes, she would.

10     Q.    What would her testimony be?

11     A.    Her testimony would be that the one bale

12  that was taken to the Bernalillo stash house, she

13  inspected it.

14          She would first testify that she was

15  aboard that aircraft, that the luggage was loaded

16  aboard the aircraft at the airport outside of Tucson

17  and flown to Albuquerque.  And the next day, she

18  inspected the one bale that was taken from the

19  aircraft that evening to the Bernalillo house.

20          And she looked at it, and she said she

21  panicked.  It was wrapped very thinly.  And she then

22  called her father and left messages in talking code,

23  but basically tried to warn him that the bales of

24  marijuana were wrapped not appropriately.

25          She then called Adrian Sanford after she

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 35

1    called her father and stated that he had messed up;

2    that he had wrapped the -- again talking in code,

3    but he had wrapped the bundles of marijuana too

4    thinly.

5              Adrian asked her, "Did they stink?"  And

6    she said most definitely, or something to that

7    effect.

8        Q.    Okay.  And why would there be a concern

9    about the marijuana being wrapped too thinly?

10       A.    Because then it would smell like

11   marijuana.  It would be obvious.

12       Q.    Okay.  Would Ayla Jarvis testify about

13   another load of marijuana that was transported by

14   plane?

15       A.    Yes, she would.

16       Q.    Okay.  What would she say about that?

17       A.    She would say that there was a load of

18   marijuana in July; that half went by ground and that

19   half went by air.

20       Q.    And by air, meaning by the airplane?

21       A.    That is correct.

22       Q.    And if you could, please tell the Court

23   about the half that she would testify went by

24   ground.

25       A.    That half was approximately 205 pounds of

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 36

1   bulk marijuana that was seized from Russell Trujillo

2   in Casa Grande, Arizona.

3       Q.    Okay.  Can you tell the Court a little bit

4   about that seizure?

5       A.    Yes.  We had intercepted telephone calls

6   between Dana and Russell Trujillo that indicated

7   Mr. Jarvis wanted Russell Trujillo to transport a

8   load.  They were trying to arrange for a rental car.

9            We then intercepted a call between

10  Mr. Jarvis and I believe it was Ralph Greene where

11  Mr. Jarvis stated that Russell was approximately

12  half an hour out.

13           At that time I contacted DEA agents in

14  Tucson, Arizona, who established surveillance on the

15  residence where Dana Jarvis was currently living at

16  that time.  When they established surveillance at

17  that location, they observed a van.  They ran the

18  plate through the Department of Motor Vehicles and

19  found that it was a rental vehicle.

20           They then waited until that van left.

21  Mr. Trujillo was driving that van.  They followed

22  that van to the town of Casa Grande, and a car stop

23  was performed.  And approximately 205 pounds was

24  seized from Mr. Trujillo, from that vehicle.

25      Q.    Okay.  And has Russell Trujillo pled

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 37

1    guilty to his participation in the drug trafficking

2    conspiracy in this case?

3        A.    Yes, he has.

4        Q.    And he has agreed to testify?

5        A.    Yes, he has.

6        Q.    And would he testify that he had been

7    transporting bulk marijuana for the Jarvis

8    organization since approximately the mid-1990s?

9        A.    Yes, he would.

10       Q.    Okay.  Now could you tell the Court about

11   another seizure of marijuana from a defendant named

12   Donald Trujillo in Nebraska on May 20th, 2005?

13       A.    Yes.  Local police officers did a traffic

14   stop on Mr. Trujillo's vehicle.  And subsequent to

15   that traffic stop, they discovered bulk marijuana

16   inside of his vehicle.

17       Q.    Approximately 200 pounds?

18       A.    That is correct.

19       Q.    And how was that marijuana packaged?

20       A.    Actually, it was in a box, in duffle bags.

21       Q.    And how was it wrapped?

22       A.    It was wrapped -- I believe that was after

23   the stash house/trailer burned down.  And I think

24   that he stated that it was wrapped thinly, but I

25   don't recall exactly how that marijuana was wrapped.

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 38

1      Q.    Okay.  Now has Donald Trujillo pled guilty

2   to his participation in the drug trafficking

3   conspiracy run by Jarvis?

4      A.    Yes, he has.

5      Q.    That was in a separate case from this?

6      A.    That is correct.

7      Q.    Has he also agreed to testify in this

8   case?

9      A.    Yes, he has.

10      Q.    And based on your interviews with Donald

11   Trujillo, what would he testify to regarding his

12   role in the Jarvis organization?

13      A.    He stated that he was a bulk marijuana

14   courier for the Jarvis organization and then also

15   transported bulk US currency as well.

16      Q.    Okay.  When would he testify he began

17   working for the Jarvis organization?

18      A.    In approximately 2002, I think.  But I

19   don't recall the date right now.

20      Q.    Would he testify about his involvement

21   with a person named Greg Hill?

22      A.    Yes, he would.

23      Q.    What would his testimony be in that

24   regard?

25      A.    Well, the load that he was stopped with in

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 39

1    Omaha, Nebraska, was actually destined for Mr. Hill

2    in Bloomington, Indiana.

3           He also would testify that he had taken

4    several multihundred-pound quantities of marijuana

5    to Mr. Hill in Bloomington, Indiana.

6           He would also testify that he actually

7    would drive -- pull up to Mr. Hill's Ramp Creek

8    address and unload the marijuana and take it through

9    his kitchen door and stash it in his house.

10   Q.    And that's Ramp Creek Road in Bloomington,

11   Indiana?

12   A.    That's correct.

13   Q.    And Donald Trujillo didn't know Greg Hill

14   by name; is that right?  He knew him by the nickname

15   Ocho?

16   A.    Ocho the masseuse.

17   Q.    Okay.  Now did you intercept a call over

18   the wiretaps that corroborated Donald Trujillo's

19   testimony regarding where the load he was arrested

20   with on May 20th, 2005, was headed?

21   A.    Yes, I did.

22   Q.    Okay.  Could you summarize that call for

23   the Court?

24   A.    That was a call intercepted between

25   Mr. Hill and Mr. Jarvis.  Mr. Hill asked about how

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 40

1    our friend Donald was, something to that effect.

2    And Mr. Jarvis said, "We'll talk about that later."

3            And then Mr. Hill made statements,

4    something to the effect that that really kind of

5    freaked me out.  He was supposed to be here in a

6    day, and then I never saw him.

7    Q.    Okay.  After the return of the indictment

8    in this case, did agents execute a search warrant at

9    Greg Hill's Ramp Creek address on August 25th, 2005?

10   A.    Yes, they did.

11   Q.    And generally, what did they find at that

12   residence?

13   A.    They found bulk US currency in the amount

14   of -- I believe it was $40,000.  They found duffle

15   bags, approximately 10 pounds of bulk marijuana,

16   items that indicated distribution of marijuana,

17   small scales, large scales, heat sealers, baggies,

18   things of that nature.

19   Q.    Okay.  And based on your training and

20   experience, those items that were found there are

21   consistent with marijuana trafficking?

22   A.    That is correct.

23   Q.    Would Donald Trujillo also testify about

24   contacts he had with Defendants David Reid and

25   George Osgood?

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 41

1    A.    Yes, he would.

2    Q.    With regard to Defendant Reid, what would

3    his testimony be?

4    A.    Mr. Trujillo stated that he met Mr. Reid,

5    I believe, at Ryan Airfield outside of Tucson,

6    Arizona, and was handed bulk US currency to take to

7    Mr. Jarvis, which Mr. Trujillo said he did.

8    Q.    Okay.  And what would he testify to

9    regarding Defendant Osgood?

10    A.    He stated that he picked up 100 pounds of

11    bulk marijuana in New York, then drove that

12    marijuana to Columbus, Ohio, and then through

13    various circuitous routes, and it wound up in

14    Chicago, Illinois.

15    Q.    Now regarding Donald Trujillo testifying

16    about picking up marijuana in New York, have you

17    interviewed a cooperating witness named J.D. LaMonte

18    who lives in New York?

19    A.    Yes, I have.

20    Q.    And what would be his involvement

21    regarding Defendant Osgood?

22    A.    His involvement with Defendant Osgood, he

23    stated in approximately 2000, 2001, he began, at

24    Osgood's request, transporting bulk marijuana for

25    the organization.  He also stored bulk marijuana for

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 42

1    the organization or for Mr. Osgood, and would

2    inventory bulk marijuana for Mr. Osgood as well.

3        Q.    Now, did you intercept calls during the

4    course of the wiretap that confirmed Mr. Osgood's

5    role in the Jarvis organization?

6        A.    Yes.

7        Q.    Can you tell the Court about that?

8        A.    We intercepted a call between Mr. Osgood

9    and Mr. Jarvis where Mr. Osgood was talking in code

10   and saying I've got, you know, 30 papers, indicating

11   that he had $30,000 for Mr. Jarvis that he had been

12   basically collecting of bulk currency to pass to

13   Mr. Jarvis.

14       Q.    Okay.  And that was a call on April 9th,

15   2005?

16       A.    That is correct.

17             MR. BRAUN:  Okay.  If I may have just a

18   moment.

19             I'll pass the witness, Your Honor.

20             THE COURT:  Who wants to start?

21             All right, Mr. Nash.

22                    CROSS-EXAMINATION

23   BY MR. NASH:

24       Q.    Mr. Stark, I wanted to go over some

25   general matters first and then talk about some of

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 43

1    the specifics of what you told us here today.  My

2    understanding is you've got a great deal of

3    experience working and investigating drug

4    conspiracies; is that correct?

5         A.    I would hope so.

6         Q.    I'm trying to be nice to you, Rich.  It's

7    okay to say yes.  You've worked in various postings

8    with DEA, and most of your work has been

9    investigating large-scale and some

10   less-than-large-scale marijuana conspiracies?

11        A.    That is correct.

12        Q.    And through the course of your time doing

13   that, you've become aware of different types and

14   styles of conspiracies; would that be correct?

15        A.    I would say so.

16        Q.    Is it fair to say that there are two major

17   types of conspiracy:  One a chain, and one described

18   as a wheel conspiracy?

19             MR. BRAUN:  Your Honor, I would object.  I

20   think this calls for a legal conclusion more than a

21   factual conclusion.

22             MR. NASH:  We've have had all kinds of

23   testimony elicited by Mr. Braun very skillfully

24   about this man's expertise at different types of

25   conspiracies, what speaks to the existence of it.

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 44

1    And I'm just trying to lay a little foundation of

2    what may be an issue of multiple versus single

3    conspiracies, Your Honor.

4              THE COURT:  I'll allow the question.  The

5    objection is overruled.

6        A.    I actually don't understand what you're

7    saying about, a wheel conspiracy.  I'm not familiar

8    with that term.

9        Q.   (By Mr. Nash)  Do you believe there are

10   different kinds of conspiracies?

11       A.    I suppose.

12       Q.    What labels do you attach to them, so we

13   can speak in the same jargon?

14       A.    Large conspiracies, small conspiracies.

15       Q.    Fair enough, sir.  In this case, is it

16   fair to say that Dana Jarvis was at the hub or the

17   center of the drug-related activities about which

18   you've spoken?

19       A.    I don't know about the hub, but he was the

20   head of a large drug trafficking organization that

21   spanned multiple districts, multiple states.

22       Q.    And everything seemed to center around

23   him; did it not?

24       A.    He was the primary figure in this drug

25   trafficking conspiracy.

**PAUL BACA, OFFICIAL COURT REPORTER**

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

1     Q.    And let's talk about what has been charged

2   as this conspiracy.  The indictment has two counts.

3   Count 1 is the marijuana conspiracy; Count 3 is the

4   money laundering conspiracy.  They appear to involve

5   the same people at the same time frame, which is

6   approximately 1990 up to and including August 25,

7   2005, which was about the time of your indictment;

8   was it not?

9     A.    I believe the indictment was on the 23rd,

10  and I believe the arrest took place on the 25th of

11  August.

12    Q.    Did you play a role in evaluating the

13  facts of this case and the decision process of how

14  to charge those conspiracies?

15    A.    I transferred my investigation to the

16  United States Attorney's office.  And in conjunction

17  with the United States Attorney's office, those

18  decisions were made.  I'm a simple investigator.

19    Q.    You talked a lot about chronology and

20  people's involvements, and I want to focus in on

21  David Reid.  When do you believe he first met with

22  and started flying for Dana Jarvis?

23    A.    Well, July 2004 I believe was when

24  Mr. Reid -- I mean Mr. Jarvis purchased November

25  three Alpha Juliette, which was the first aircraft.

**PAUL BACA, OFFICIAL COURT REPORTER**

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 46

1    And then some time after that, he needed a pilot to

2    fly that aircraft.

3              And my understanding was that he found

4    Mr. Reid through the Falcon Executive organization.

5    And so some time after that is when Mr. Reid began

6    flying for Mr. Jarvis.

7    Q.    You've talked to a lot of people in this

8    case and you've developed a lot of investigative

9    leads.  Is it fair to say that your investigation

10   has shown there was a period of time when you would

11   agree that David Reid did not know what was going on

12   with the Jarvis organization after he went to work

13   for Mr. Jarvis?

14   A.    I --

15   Q.    I will ask it in a more simple way.  Let

16   me try it again.  What is the first event or first

17   date that your investigation has reflected that you

18   believe, as part of your summary testimony here

19   today, that David Reid knew what was going on with

20   Dana Jarvis?

21   A.    You know, I could not put a date on that

22   today because there were so many intercepted

23   telephone calls and so many cooperating defendant

24   witness statements.  I would have to go through

25   everything and lay out a timeline.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 47

1           But I can say that it was definitely some

2    time after Mr. Reid began flying for Mr. Jarvis.

3       Q.    So you would agree that there was at least

4    some period that we're uncertain of right now before

5    you claim that your evidence shows that Reid became

6    aware of the drug-trafficking activities of Dana

7    Jarvis?

8       A.    If you're saying that Mr. Reid worked for

9    Dana Jarvis for a time and then was aware of his

10   drug-trafficking activities, the answer would be

11   yes.

12      Q.    Fair enough, sir.  Why do you believe this

13   is a single conspiracy, as opposed to multiple

14   conspiracies?

15           MR. BRAUN:  And again I would object on

16   the basis of that calls for a legal conclusion.

17           MR. NASH:  He's an experienced agent.

18   He's here to say this was a single conspiracy.

19           The issue you have to resolve, Your Honor,

20   on single versus multiple, is critical to the

21   admission of co-conspirator hearsay.  If you have

22   one conspiracy that goes from January to June and

23   another one from July to December, statements from

24   number one are admissible in number two.

25           One of the things you have to decide, even

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 48

1    based on the summary testimony, is it one or is it

2    multiple?  This is a witness they have chosen to

3    bring in.  He knows the facts.  I think he's

4    appropriate to answer the question.

5              THE COURT:  All right.  The objection is

6    overruled.  You may answer the question.

7              MR. NASH:  Do you remember the question,

8    Rich?

9              THE WITNESS:  Multiple or single

10   conspiracy.

11             MR. NASH:  Yes, sir.

12        A.    I'm not an expert, as far as the legal

13   conclusions, on what any single or multiple

14   conspiracy are.  But I would say that everything

15   that our investigation showed is that it was a

16   tight-knit, large drug organization, and everything

17   fit.

18             Mr. Reid's actions fit with the illegal

19   activities of Ayla Jarvis and with others that have

20   testified.  The conspiracy was from 1990 through the

21   time that we made the arrests, and everything was

22   intermingled.

23             I didn't see -- in my investigation, I

24   didn't see separate pieces that you could just pull

25   out and say okay, this one was completely isolated

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 49

1    from all the other events, if that's what you're

2    asking.

3        Q.    It is, sir.  Let me ask you some specific

4    questions that your response brings to mind.  Did

5    your investigation develop at various times that

6    Dana Jarvis had different suppliers of marijuana?

7        A.    He had multiple suppliers of marijuana.

8        Q.    Did your investigation confirm that one

9    supplier may be working at one period of time, and

10    years later that supplier may be gone and another or

11    more than one new suppliers would take his place?

12        A.    It was more a kind of an intermingling.

13    He would purchase marijuana.  According to one of

14    the sources of supply, Jorge Moffet Ortiz, he said

15    that he was supplying Dana Jarvis, but he knew that

16    Mr. Jarvis was supplied by multiple other people.

17            And there was this kind of mix and match

18    when Mr. Jarvis -- I'm assuming that he got a

19    cheaper price or something.  But it was always there

20    were just different people that were kind of

21    rotating in and out.  It wasn't kind of a

22    start/stop, start/stop.  It was always intertwined.

23        Q.    Certainly you're not saying that every

24    supplier was there from the beginning to the end?

25        A.    No.  There were definitely people that

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 50

1    moved out of the organization, and he gravitated

2    towards others.

3        Q.    Is it fair to say that there were other

4    workers within the organization that performed

5    different roles that came and went at various times

6    from the organization?

7        A.    Yes.  They gravitated in and out, that's

8    correct.

9        Q.    People would work for a while and be gone

10   forever.  And new people would come in later, as did

11   Mr. Reid, correct?

12       A.    Correct.

13       Q.    Would Mr. Jarvis operate at different

14   times primarily from different locations through the

15   years?

16       A.    Yes, in the sense that the drug operation

17   was continually ongoing in the sense that he had a

18   weed season.  He would start in the fall and run it

19   through the summer.

20            But during that continuum, Mr. Jarvis -- I

21   would say that the primary focus was based, you

22   know, in Arizona, New Mexico and then wherever else

23   the drugs were distributed.  But during that

24   continuum, it just depended on where Mr. Jarvis was.

25            The organization still ran as he wished.

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 51

1    But he may be in Arizona for a time; he may be in

2    California; he may be in New Mexico; he may be on

3    the East Coast.  But he was able to run his

4    organization from different locations.

5         Q.    And at various times he would reside in

6    the places you talked about, California, Tucson, New

7    Mexico?

8         A.    Correct.

9         Q.    Did your investigation reflect that there

10   were different purchasers of the marijuana through

11   the years and in different locations?

12        A.    Different purchasers of marijuana?

13        Q.    Yes.

14        A.    And in different locations?

15        Q.    Yes.  Let me break it up.  For example,

16   you are not saying that there were people that were

17   purchasers of marijuana from 1990 through and

18   including 2005, are you?

19        A.    Well, I don't know if I had all of the end

20   user people.  I can say that Mr. Jarvis from 1990 to

21   2005 was distributing ton quantities of marijuana

22   through Arizona, New Mexico, Colorado, Indiana and

23   the East Coast.  And so I don't know if the end

24   users on one end or the other changed.

25        Q.    Stated a different way, you have no

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 52

1    evidence that you can offer today that there was

2    continuity of purchasers or continuity of locations

3    where marijuana was sent from beginning to end?  It

4    changed as the years went by; did it not?

5        A.    Not the locations specifically.  Maybe the

6    end purchasers, which I don't have any information

7    on.  But for the most part, Arizona was always in

8    the mix.  New Mexico, Colorado was long-term;

9    Bloomington, Indiana; New York; Connecticut, to my

10   knowledge.

11           And from the information that I have

12   through my investigation, those were the consistent

13   distribution points throughout my investigation of

14   the time period of this conspiracy.

15       Q.    My understanding, from what Mr. Braun was

16   asking you here today, is that your information

17   comes in the main about the details of the

18   organization from interviews that have been done by

19   yourself and other law enforcement professionals of

20   cooperators.

21       A.    That is correct.  A great deal of

22   information has come from them.

23       Q.    And the other information, such as the

24   handoffs, the seizures, the calls, tended to

25   corroborate the sequence of events and description

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 53

1    of events and activities that the cooperators gave

2    you?

3        A.    I would say that's a fair statement.

4        Q.    And when I say -- I don't have a

5    definitional problem with the questions I'm going to

6    ask now.

7            When I say cooperator, I mean anyone that

8    furnishes information to you, whether it's for

9    money, to work off their own case, for a vindictive

10   purpose, good citizen, charged or uncharged, a

11   source of information, confidential source, CW,

12   however it's used to label them.  Are you

13   comfortable with that broad a definition?

14       A.    I don't know if I would want to meld

15   together sources of information, confidential

16   sources of information, cooperating defendant

17   witnesses and cooperating witnesses, I think.

18       Q.    Why do you want to separate those?

19       A.    I think that it's very easy to then pull

20   information, for instance, on cooperating defendant

21   witnesses into statements that were made by

22   confidential sources such-and-such, and then you get

23   kind of a cross mix.  And we're very careful about

24   protecting our confidential sources.

25       Q.    And I'm not here to ask you about names;

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 54

1    I'm not here to ask you about identifying

2    information.  But what I do want to ask you about is

3    anybody who was involved in this organization,

4    anyone that was on the inside and anyone that's

5    given you information.  Are you comfortable with

6    that if we don't get into --

7        A.    We'll see where we go.

8        Q.    Fair enough.  You've talked about some of

9    the sources.  And I want to take a couple of

10   different time frames.  The names that you've given

11   us here today are not the exclusive list of folks

12   that fit my definition that gave you information, is

13   it?

14       A.    That is correct.

15       Q.    There's more than the folks than you've

16   mentioned?

17       A.    There are several cooperating defendant

18   witnesses, correct.

19       Q.    And Mr. Braun asked you about different

20   times in the investigation.  One is from when you

21   started in 2002 up to the wiring going up in March

22   of '05.  Let me isolate each of these periods that

23   he asked you about and ask you some questions about

24   each of them.

25            Can you tell us how many cooperators fit

Page 55

1    that definition that we have agreed upon which you

2    had during that time block?  In other words,

3    preinitiation of wire in March of '05.

4         A.    Okay.  So preinitiation of March of '05?

5         Q.    Yes, sir.

6         A.    We had three confidential sources that

7    provided information regarding the Jarvis

8    investigation.

9         Q.    And again, so we don't have definitional

10   problems, are you using the definition of anybody in

11   the inside who feeds law enforcement information as

12   being a confidential source?

13        A.    I'm stating we had three confidential

14   sources that provided information about the Jarvis

15   organization.

16        Q.    But what I don't want to have is a problem

17   later, sir, if we ever cross-examine you on this.

18   When I say confidential source, I exclude people on

19   the inside that we label cooperating defendants.

20             I don't care whether they're a defendant

21   or not.  They're just somebody who knows about what

22   they speak because they're on the inside of the

23   Jarvis organization that give you info.  That's my

24   definition of a cooperating person.

25        A.    Okay.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 56

1    Q.    And did you have three that fit that

2    definition prewire?

3    A.    We had three individuals that had

4    information -- that were confidential sources of

5    information that had information about the Jarvis

6    drug trafficking organization.  You've got to talk

7    simply.  I'm just an agent.

8    Q.    A total of three, sir?

9    A.    That is correct.

10    Q.    Now let's go from the time period of the

11    wire going up.  Mr. Braun talked to you about -- I

12    think it was March '05 through indictment, which was

13    the end of August '05.

14          Were there new people that got added to

15    the list of people on the inside who were

16    cooperating with law enforcement in any way, in

17    addition to those three?

18          MR. BRAUN:  Your Honor, I would object as

19    to the relevance of when people began cooperating,

20    in terms of this hearing.

21          THE COURT:  What is the relevance of that,

22    Mr. Nash?

23          MR. NASH:  I'm just trying to build a

24    foundation.  When we go back and look at the

25    transcript, Mr. Braun took a very careful -- he did

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 57

1    a very careful job of outlining when these people

2    cooperated and when they came into the mix.

3            I'm just trying to find out how many

4    others there were during the period.  This is the

5    end of my inquiry in the area.  If there were more

6    during that second period, then I'm finished with

7    this line of questioning.

8            THE COURT:  Anything else?

9            MR. BRAUN:  I don't think I necessarily

10   asked about when people began cooperating, except to

11   the extent that they were cooperating defendant

12   witnesses, and so it was obviously after they were

13   indicted.  That's not really relevant to this

14   hearing.

15           What's relevant is when were they

16   participants in the organization, not when did they

17   begin cooperating.

18           MR. NASH:  If that were true, then one

19   wonders why he spent so much time asking Agent Stark

20   when they came into the fold and when they started

21   giving information.

22           And I agree that the time period

23   postindictment is not relevant to this inquiry.

24           THE COURT:  Well, I'll allow the question.

25   And you did say you were nearing the end of that

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 58

1    inquiry, so I will allow it.

2        Q.   (By Mr. Nash)  How many more got added,

3    Agent Stark, to the list of three between March '05

4    and August, when the indictment was returned?

5        A.    I'd have to look at when we had

6    cooperating defendant witnesses.  I can say probably

7    one.

8        Q.    Perhaps more?  You'd have to look at your

9    list?

10       A.    I'd have to look.

11       Q.    Fair enough.  Thank you.  Let me move on

12   to some of the specifics that you told Mr. Braun

13   about.

14            Let's talk first about the Barbara Hanna

15   Houston, I believe it was, cash seizure.

16       A.    Dallas/Fort Worth.

17       Q.    Dallas, I'm sorry.  Was that an

18   independent investigation or a handoff in the

19   fashion of some of the other things that you told

20   Mr. Braun about?

21       A.    It was an investigation that occurred in

22   1992.  And in the course of investigating the Jarvis

23   organization, we actually pulled up from the

24   archives and were then able to corroborate some

25   information.

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 59

1    Q.    Fair enough.  The seizure of cash from

2    Ayla Jarvis, I take from your description, was a

3    handoff.  You were involved in that.  You handed it

4    off to local law enforcement and other federal

5    agencies there to do the work that you described?

6    A.    That is correct.  I contacted DEA agents

7    in Indianapolis.

8    Q.    You talked about a conversation that Ayla

9    Jarvis had with David Reid postseizure of the money.

10    And I want to make sure I understand what you said.

11        And I think Dana Jarvis was involved in

12    the conversation as well.  People specifically told

13    Mr. Reid that the money was not drug related; was

14    that your testimony?

15    A.    That is correct.  And I believe Ayla

16    overheard Mr. Reid talking to Mr. Jarvis on the

17    telephone.  And he asked Mr. Jarvis, "This money

18    isn't drug related," or something to that effect.

19    And Mr. Jarvis assured him that it was not.

20    Q.    Thank you, sir.  You talked about Ayla

21    also discussing Mr. Reid arriving at a location, and

22    there was a bag of cash from Mr. Ripley.

23    A.    That is correct.

24    Q.    And we didn't flesh that out.  Was the bag

25    opened in the presence of Mr. Reid?

**PAUL BACA, OFFICIAL COURT REPORTER**

1      A.    I don't know.

2      Q.    Are you aware of any conversation that

3  Ms. Jarvis has told you about that would have put

4  David Reid on notice that there was even money in

5  the bag, let alone the source thereof?

6      A.    I would have to review her statements.

7  But from what I remember, she stated that he handed

8  her a bag, and it was bulk cash from George Ripley.

9  And he made the statements about the bag smelling

10  like marijuana.  And if your bag smelled anything

11  like this, no wonder it got taken or seized,

12  something like that.

13      Q.    And her debrief report would accurately

14  set out the totality of her statement?

15      A.    I would say that it would set out what I

16  wrote down.  What she testifies to as far as

17  details, she may have more.  I don't . . .

18      Q.    You don't --

19      A.    I don't know.

20      Q.    Well --

21      A.    I'm not sure I asked her that.

22      Q.    You're not sure you asked her if David

23  Reid even knew there was money in the bag?

24      A.    No.  I'm not sure I asked her about any

25  details as far as exactly how the handoff occurred.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 61

1       Q.    Do you have any information to suggest

2    that David Reid knew there was money in the bag at

3    that time?

4       A.    I don't know.

5       Q.    Thank you, Agent Stark.

6             You talked also about a Lazy B stash

7    house/trailer located near Tucson, Arizona.

8       A.    Correct.

9       Q.    You talked about an incident where

10   people -- I think Sam Jones and Adrian Sanford --

11   were packaging marijuana, and David Reid's name

12   surfaced in that series of questions and answers.

13            My understanding is there's no information

14   to suggest that you received from the cooperator

15   that Mr. Reid was present for any packing or loading

16   of marijuana in that stash house/trailer, correct?

17      A.    I don't remember any statements stating

18   that he was there at the trailer.

19      Q.    Thank you, sir.

20            You talked about what looks to be a

21   handoff or controlled stop and seizure of Russ

22   Trujillo on the half of the load in July that Ayla

23   told you about.  Do you recall that incident?

24      A.    Correct.

25      Q.    Was that, too, a handoff like the prior

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 62

1    situation?

2        A.    That was we contacted the DEA agents that

3    had been working with us the entire time on this

4    case in Tucson and passed that information to them.

5        Q.    The seizure in Nebraska fits within that

6    same characterization; does it not?

7        A.    No.

8        Q.    It was a handoff as well?

9        A.    No, it was not.  We had no knowledge of

10   that stop until we were notified by the local

11   authorities that they had run Donald Trujillo's

12   name, I believe, through a database, and found out

13   that we had a case on him.  And we were notified at

14   that point.

15           MR. NASH:  If I could have just one

16   moment, Your Honor?

17           THE COURT:  You may.

18           MR. NASH:  That's all I have at this

19   hearing.

20           And my understanding is this is more or

21   less a proffer by the government under the relaxed

22   rules, and it's not the time for me to cross-examine

23   on any report inconsistencies or other items.  With

24   that, that's all I have.

25           Thank you, sir.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 63

1          THE COURT:  Any other cross?

2          Mr. Blackburn.

3                    CROSS-EXAMINATION

4    BY MR. BLACKBURN:

5        Q.    Agent Stark, you said that initially you

6    first started the investigation as it relates to the

7    Jarvis drug organization in 2002; is that correct?

8        A.    That is correct.

9        Q.    What was the initial event, if anything,

10   that started -- whether it's -- what was the initial

11   incident that started the investigation in 2002 as

12   it relates to this organization?

13       A.    My partner here in Albuquerque, named

14   Special Agent Hella, was based in Tucson at the

15   time.  And he called me and provided information and

16   said, "I have some information that there may be a

17   possible drug trafficker in Albuquerque by the name

18   of Dana Lanew," and that's how this investigation

19   began.

20       Q.    Okay.  And --

21       A.    I want to strangle him every day.

22       Q.    Well, when you get to retire soon, you can

23   go strangle him after this case is over, I guess,

24   right?

25               And then is it safe to say that your

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 64

1    attention started in 2002 where you were devoted

2    pretty much full time to that up until -- or that

3    took a lot of your time, obviously, from the time it

4    started in 2002 basically up until -- we're talking

5    up until the time of the indictments, that you were

6    working pretty much exclusively on that particular

7    case?

8        A.    No, not initially.

9        Q.    Okay.  When did it become that you became

10   pretty much dedicated completely to the Dana Jarvis

11   drug case as it relates to your initial

12   investigation?

13       A.    An approximate date?

14       Q.    Yeah.

15            MR. BRAUN:  I would object to the

16   relevance of this.

17            MR. BLACKBURN:  Well, Your Honor, he

18   started out with tendering -- okay, when did you

19   start working on this in 2002, and what did you do?

20   And I'm trying to figure out how it relate to his

21   investigation as to how it relates to these

22   conspiracies.

23            THE COURT:  I'm not quite sure I follow

24   what you just said.  Could you --

25            MR. BLACKBURN:  I was just saying that

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 65

1    when Mr. Braun first started, there was the initial

2    colloquy of having him being introduced as to his

3    familiarity with the Dana Jarvis organization.  And

4    he started with what he did in 2002 and asked a few

5    things and then moved to 2005 as it relates to

6    wiretaps and seizures.

7              I'm just trying to go back and see what

8    there was during those periods of time as it relates

9    to this because it relates to his knowledge of this

10   particular organization that he's testifying about

11   as relates to whether or not there was a Jarvis

12   conspiracy.  That's all I'm doing.  I'm cleaning up

13   his background information.

14             MR. BRAUN:  But whether he was working

15   exclusively on this case or other cases is not

16   relevant to that inquiry, Your Honor.  And that was

17   his question.

18             THE COURT:  The question was about when

19   he -- as I understood your question anyway, you

20   asked about when this case became his primary

21   assignment, or words to that effect.

22             MR. BLACKBURN:  Okay.  I'll rephrase it.

23        Q.   (By Mr. Blackburn)  After you first got the

24   initial contact in 2002, what was the first issue

25   that you did as it relates to the investigation of

**PAUL BACA, OFFICIAL COURT REPORTER**

1    the Jarvis drug organization when you first started

2    this matter?

3        A.    It was in 2002.  I can't tell you the

4    exact nature, but generally I can say that this

5    began as any other investigation, with information.

6    And then you slowly build, corroborate, build, get

7    that information.  And then as the investigation

8    gets larger and larger and larger, more and more

9    resources are dedicated to that case.

10       Q.    All right.  Obviously, Mr. Nash went over

11   some of this stuff about cooperating witness and

12   cooperating individuals and when certain things

13   happened as to what was a handoff, as opposed to

14   your basic hands-on investigation, I guess, as

15   opposed to historical matters.

16            One of the things that you talked about

17   obviously in the beginning was with Ms. Hanna,

18   Barbara Hanna.  Do you remember that testimony?

19       A.    Right.

20       Q.    And you talked about the information that

21   you learned from her concerning how she first became

22   involved in this in the 1990s; is that correct?

23       A.    That is correct.

24       Q.    And starting in Boston as a call girl;

25   correct?

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 67

1       A.     That is right.

2       Q.     When did you first learn the information

3    that came from Ms. Hanna?  Was that through your

4    individual interview with her concerning how she

5    first became involved in the Jarvis organization?

6              MR. BRAUN:  Objection.  When Agent Stark

7    became aware of certain information is not relevant

8    to the question of whether a conspiracy existed in

9    this case and whether these defendants were members

10   of that conspiracy.

11             MR. BLACKBURN:  Well, maybe I'm just

12   premature for the next hearing that's getting ready

13   to happen, so I will rephrase that question at this

14   point in time.

15             THE COURT:  All right.

16      Q.    (By Mr. Blackburn)  Let me do it this way.

17   When was the first time you ever received

18   information concerning Greg Hill?

19      A.     I would have to go back through our

20   investigation and all the reports.  But we had

21   information that there was an individual in

22   Bloomington, Indiana, that was distributing large

23   quantities of marijuana and also shipping back large

24   sums of cash.  And at some point in the

25   investigation we were able to identify Mr. Hill as

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

1    that individual.

2        Q.    And when was it that you identified him as

3    being that individual?

4        A.    This has been a long case.  And to put a

5    date on that specific incident at this point would

6    be . . .

7        Q.    When is it your belief, as the agent in

8    charge of this case, that Mr. Hill joined -- I guess

9    it's your testimony today that Mr. Hill was

10   obviously involved in this Dana Jarvis drug

11   organization, as you call it; is that correct?

12       A.    That is correct.

13       Q.    According to your testimony and your

14   knowledge, when was it your belief that Mr. Hill

15   joined the conspiracy?

16       A.    Well, I know that we had cooperating

17   defendant witness testimony.  For instance, Donald

18   Trujillo that delivered, you know, multi, multi,

19   multihundred-pound quantities to Mr. Hill's

20   residence, his Ramp Creek --

21       Q.    At the Ramp Creek residence?

22       A.    Yes.  And we also have other cooperating

23   independent witnesses that took bulk marijuana to

24   Mr. Hill.  And I would have to review their witness

25   statements to put the exact date as far as when --

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

1    well, we believe Mr. Hill had been a long-time drug

2    associate of Mr. Jarvis.

3        Q.    And what I have gathered here today is you

4    have the information basically that was tendered as

5    to how you would bring Mr. Hill into this conspiracy

6    as it relates to at least today's testimony from the

7    incident from Ayla Jarvis in October of 2004; is

8    that correct?  The flight from Tucson to Oklahoma

9    City and from Oklahoma City to Bloomington and the

10   Cracker Barrel --

11       A.    Are you saying that's how we brought him

12   into the conspiracy?

13       Q.    No.  I'm saying that's one of the

14   incidents that you're talking about as it relates

15   Mr. Hill to this drug trafficking organization,

16   correct?

17       A.    That's one instance.

18       Q.    Okay.  And then you talked about the

19   situation also with Donald Trujillo, that there was

20   a load that was seized in May of 2005 in Omaha,

21   Nebraska, that Mr. Trujillo now tells you was being

22   destined for Bloomington, correct?

23       A.    That is correct.

24       Q.    And the subsequent telephone call or

25   wiretap at or near that time between Mr. Jarvis and

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 70

```
 1    Mr. Hill concerning Donald and what happened to

 2    Donald, so as to say, right?

 3         A.    Correct.

 4         Q.    Is that correct?

 5         A.    Right.

 6         Q.    And are there other defendant cooperators

 7    who have been indicted other than Ayla and Donald

 8    that have indicated to you that Mr. Hill was

 9    involved in this drug trafficking organization?

10         A.    Yes.

11         Q.    And who are those?

12         A.    I don't know if this is a full list, but I

13    can say that Geno Berthod also distributed --

14    transported marijuana to Mr. Hill.

15         Q.    Also known as Old Man, right?

16         A.    That is correct.  And as a matter of fact,

17    the money that was seized from Ayla Jarvis in

18    October of 2005 that Mr. Hill delivered to her had a

19    slip of paper in it that said Old Man, and there

20    were some figures as well.

21         Q.    Hold that thought for a second.  Just to

22    make sure, I want to make sure that we've got --

23    when you initially testified, you said it was this

24    talking about the seizure from the Cracker Barrel of

25    the $287,000, I think you initially said October of
```

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 71

1    2004.

2        A.    And you know what?  I'm going to have to

3    review that.  I've got the record.  It's '04, I

4    think, or did I just say '05?

5        Q.    Yeah.  You said '04 one time, and you said

6    '05 another time.

7            THE WITNESS:  I apologize to the Court.

8        Q.    (By Mr. Blackburn)  All right.  I'm sorry.

9    I didn't mean to interrupt you about Geno, okay?

10        A.    So Geno -- and I would have to review

11    other -- everybody else that's testified.  But

12    that's what -- oh.  And I believe I'd have to review

13    Dan Shulman's testimony as well.

14        Q.    All right.  Let me go back.  When you were

15    talking about Barbara Hanna, you indicated the

16    information that you found out about her in Boston.

17    And then it was the 1992 seizure of the $25,000 in

18    Dallas, correct?

19        A.    That is correct.

20        Q.    And then you said in late 2001, 2002, that

21    she was involved in bringing money back.  At one

22    point in time you said that she was involved in

23    taking money to and from Bloomington, Indiana, or

24    you mentioned a number of places.  But you said

25    Bloomington, Indiana.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 72

1           Did she specifically tell you that she was

2    involved with Greg Hill, as it relates to her role

3    in the Jarvis drug organization, in taking money or

4    marijuana to Mr. Hill in Bloomington, or was there

5    somebody else in Bloomington?

6        A.    No.  She described the person that she

7    picked the money up from as a big, hairy guy.  I

8    believe that's all she could identify.

9        Q.    All right.  Was there ever any information

10   that you had in the course of your investigation

11   that indicated that there may be somebody else

12   involved with Mr. Jarvis starting from 1990 to 2005

13   that he may have been supplying marijuana to in

14   Bloomington, Indiana, who was identified in that

15   area, other than Greg Hill?

16       A.    Our indication was that Mr. Jarvis had an

17   associate in Bloomington, Indiana, that he used to

18   deliver bulk marijuana to and that Mr. Hill then

19   took over that position for that individual.

20       Q.    Okay.  And so now I'm going to go back and

21   ask the same question.  Do you know, based upon that

22   information, when Mr. Hill took over?

23       A.    I couldn't put a date on it right now.

24       Q.    All right.  But it wasn't obviously in the

25   early 1990s and 1992?  We're not talking about that

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 73

1    time period, are we?

2        A.    I don't believe so.

3        Q.    All right, okay.  So Ms. Hanna was talking

4    about a big, hairy guy, correct?

5        A.    Correct.

6        Q.    All right.  And the situation with Ayla

7    Jarvis and the $287,000 in October of '04 or '05 --

8    but I think it's really '04 -- that was a handoff

9    that you all did to the Indiana police; is that

10   correct?

11       A.    Well, I wouldn't call it a handoff.  The

12   Indianapolis DEA office had been working with us

13   from the time we had information that there may be

14   drug trafficking in Indianapolis.  I brought

15   everybody on line.  And that was simply passing on

16   information that okay, we believe something is

17   happening right now.

18            And they set up -- they established

19   surveillance on the airport.  They worked with us

20   throughout the investigation.

21       Q.    The investigation, all right.  And other

22   than what you have mentioned here today about the

23   surveillance in Bloomington at the Cracker Barrel

24   and the subsequent stop of Ayla and her

25   conversations and the subsequent conversations that

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 74

1    occurred out at the airport and Mr. Reid calling the

2    trooper and stuff, your investigation did not

3    reveal, did it, that any contact was made with

4    Mr. Hill at the time to seize any items he had in

5    his vehicle or anything that related to something

6    that may be in his house during that October 2004

7    period of time; is that correct?

8        A.    I'm not sure what you're asking.

9        Q.    For instance, Ayla Jarvis was pulled over.

10   You knew that there was a -- you were under the

11   belief that this was a load of marijuana leaving

12   Tucson and going to Oklahoma City, Oklahoma, because

13   you were trailing the plane?

14       A.    We actually believed that it was a money

15   pickup.

16       Q.    I'm sorry, a money pickup.  And then

17   Ms. Jarvis was stopped or detained after making an

18   illegal U-turn wherein this money was discovered,

19   correct?

20       A.    Correct.

21       Q.    All right.

22       A.    And she stated she got it from a guy named

23   Greg.

24       Q.    Okay.  And my question was:  To your

25   understanding, did the Indianapolis police or

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 75

1    anybody do anything else associated with Mr. Hill at

2    that time concerning pulling him over for an illegal

3    U-turn or trying to detain him or search anything in

4    his vehicle or anything in his house subsequent,

5    within the next week or two?

6        A.    It wasn't really the Indianapolis police.

7    It was it was a trooper that was under the direction

8    of DEA agents.  And DEA started two cases, one on

9    Greg Hill to wall things off, and also to establish

10    a case on Ayla Jarvis.

11        Q.    All right.  So prior to that time -- you

12    know, I'm trying to focus on it now -- had you heard

13    of the name Greg Hill, or had that name come up in

14    your investigation as his involvement in this

15    conspiracy prior to this October 28, 2004, incident

16    that happened in Bloomington at the Cracker Barrel?

17        A.    I believe the name Greg had come up; the

18    name Oso, which is Bear.

19        Q.    Oso or Ocho?

20        A.    Well, Donald Trujillo remembered it as

21    Ocho; other people remembered it as Oso, Bear.

22              There was also a seizure of bulk US

23    currency, $400,000, from Jude Austin and Cara Gold,

24    and I can't remember the date.  And there was a slip

25    of paper in there, Bear.

**PAUL BACA, OFFICIAL COURT REPORTER**

1      Q.    All right.  So we've got differences

2    between Ocho, which is eight, and Oso, which some of

3    them were calling Bear; is that correct?

4      A.    Ocho, Oso; it sounds pretty similar.

5      Q.    Was there any reason to believe during the

6    course of your investigation that there was somebody

7    else who may have also been identified in the area

8    of Bloomington or in Kentucky who may have been also

9    known as Bear?

10     A.    No.  The individual known as Bear, our

11   investigation revealed, what information we have, is

12   that it was Greg.

13     Q.    It was Mr. Hill?  All right.

14          Any information that you had in the course

15   of the investigation that indicated that Mr. Hill

16   had any direct communications with the two remaining

17   defendants in this case, Mr. Reid and/or Mr. Osgood?

18     A.    I don't believe so.

19          MR. BLACKBURN:  Okay.  May I have a

20   second, Your Honor?

21          THE COURT:  You may.

22          MR. BLACKBURN:  I have nothing further,

23   Your Honor, at this time.

24          THE COURT:  All right.  Thank you,

25   Mr. Blackburn.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 77

1          Ms. Sirignano.

2          MS. SIRIGNANO:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4  BY MS. SIRIGNANO:

5     Q.    Agent Stark, can you tell me when

6  Mr. Osgood joined the conspiracy in the Jarvis drug

7  trafficking organization?

8     A.    I can't give you the exact date.  He was

9  one of his oldest associates.

10    Q.    And what do you mean by associate?

11    A.    Drug associate.

12    Q.    Okay.  What does that mean to you?

13    A.    A person who distributed or purchased

14  marijuana from Mr. Jarvis and then distributed it or

15  was associated with the drug organization.

16    Q.    And what evidence do you have that he

17  purchased marijuana and distributed it on behalf of

18  Mr. Jarvis?

19    A.    We have cooperating defendant witness

20  statements.  We have witness statements.  We have

21  all the evidence in the form of ledgers, things like

22  that.

23    Q.    Okay.  Let's talk about the cooperating

24  witness statements.  You referred to one today, this

25  DW 20 or J.D. LaMonte; is that right?

**PAUL BACA, OFFICIAL COURT REPORTER**

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

1      A.    That is correct.

2      Q.    Okay.  And I reviewed this report briefly

3  that I got yesterday.  And can you explain to me how

4  this Mr. LaMonte is tied into the Jarvis drug

5  trafficking organization?

6      A.    Mr. LaMonte is tied into the organization

7  through Mr. Osgood, in the sense that Mr. Osgood

8  directed Mr. LaMonte where to go to pick up the bulk

9  marijuana in Pennsylvania and gave him directions.

10  He told him the key would be on the front driver's

11  side tire.

12          He would talk in code.  He said, "It's

13  green.  You know where to go," gave him the color of

14  the van and gave a license plate.  Mr. LaMonte would

15  go pick up the van, and then Mr. Osgood would direct

16  him where to deliver that van, and he would repeat

17  the process.

18          He would drop the van off and leave the

19  key on the front tire, or he would actually take it

20  to his residence and store it there and/or inventory

21  it for Mr. Osgood.

22      Q.    And what year was this?

23      A.    2000.  I believe 2000, 2001.

24      Q.    And so what was Mr. Jarvis' role in all of

25  this?

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 79

1      A.    Mr. Jarvis was the head of the

2    organization that then brokered marijuana purchases

3    from sources of supply in the Republic of Mexico and

4    then distributed that marijuana to other dealers,

5    who then took that marijuana and distributed it to

6    other individuals throughout the United States.

7      Q.    Okay.  So let's break this down

8    specifically then, because I fail to see any mention

9    of Mr. Jarvis in this DEA 6 that you gave me.

10          Who did -- tie in Jarvis for me with

11   Mr. Osgood in 2000 with Mr. LaMonte specifically.

12     Q.    Specifically?

13     Q.    Yes.

14     A.    The individual that transported bulk US

15   currency from the different distribution sites

16   throughout the United States, one of them, his name

17   was Rafal Mistrzak, whose nickname was Alex.  That

18   is the individual that Mr. Osgood directed

19   Mr. J.D. LaMonte to meet with and to furnish US

20   currency that was the proceeds of drug distribution

21   on the East Coast.

22     Q.    And that was in 2000?

23     A.    And that was in 2000.

24     Q.    And do you know if Mr. LaMonte knew Rafal

25   Mistrzak?

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 80

1    A.    He did not know him as Mistrzak.  He knew

2  him as Alex, which was his code name not only in the

3  organization, but his drug name in the drug ledgers

4  as well.

5    Q.    So LaMonte knew Alex then?

6    A.    I wouldn't say knew him.  He met with him

7  and passed bulk US currency to that individual.

8    Q.    Okay.  I'm sorry, I'm not following you.

9  When did Alex meet with LaMonte?

10    A.    On several different occasions in

11  Middletown, New York.

12    Q.    What dates?

13    A.    I don't have those dates.

14    Q.    Is it fair to say that it could have been

15  way past the year 2000?

16    A.    2000?  Well, I doubt it because

17  Mr. LaMonte videotaped one of the loads that he

18  picked up for Mr. Osgood.  And that video has a

19  time/date stamp of November 18th, 2000, I believe.

20  And so I believe that he probably met with Alex in

21  2000 and 2001.  He said he was involved in 2000 and

22  2001.

23    Q.    He was involved -- LaMonte was involved in

24  2000 and 2001?

25    A.    Correct.

**PAUL BACA, OFFICIAL COURT REPORTER**

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 81

1    Q.    I'm having difficulty, though, tying the

2    dates in here with this overarching conspiracy that

3    you described previously.

4          Isn't it possible that these dropoffs in

5    Middletown, New York, happened way past 2000; that

6    they were more into 2004 and 2005, when the wiretap

7    was up?

8    A.    I'll bet there were additional ones, yes.

9    The ones that Mr. LaMonte personally handled, he

10   believed, were in 2000 and 2001.  But we believe

11   Mr. Osgood was involved in the distribution of

12   marijuana through 2004 and 2005 as well.

13   Q.    Okay.  So what direct evidence do you have

14   that links Mr. LaMonte with the Jarvis drug

15   trafficking organization?

16   A.    Mr. Osgood.

17   Q.    Okay.

18   A.    And Mr. Mistrzak.

19   Q.    So you don't have any evidence that

20   LaMonte actually knew Mr. Jarvis himself?

21   A.    LaMonte said he did not know.  He said

22   that Mr. Osgood worked for somebody else.  He made

23   comments.  When they were doing things certain ways,

24   he would be like, "Don't do that because the boss

25   won't like that," things like that.  So he indicated

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 82

1    that Mr. Osgood was actually working for someone

2    else.

3         Q.    And who was that?

4         A.    Our through our investigation, we believe

5    that was Mr. Jarvis.  And Mr. LaMonte never met

6    Mr. Jarvis.

7         Q.    So the only link that you have to the

8    Jarvis organization or to Mr. Jarvis himself is

9    through Mr. Osgood, correct?

10        A.    Mr. Osgood was one of his distributors on

11   the East Coast of the United States, yes.

12        Q.    But in what year was that?  What years are

13   you talking about?

14        A.    We were told Mr. Osgood was one of his

15   oldest clientele or distributors.  And actually, the

16   drug ledgers confirm it as well.

17        Q.    Yes.  But the drug ledgers are years

18   later, in 2004, 2005, correct?

19        A.    Correct.

20        Q.    So I'm back in 2000, 2001 with

21   Mr. LaMonte.  Isn't it fair to say that it's a

22   possibility that the marijuana that Mr. LaMonte had

23   photographed himself in front of did not come from

24   the Jarvis drug trafficking organization?

25        A.    I don't believe so.  It was wrapped as the

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 83

1    Jarvis organization wrapped it.  The bale numbers

2    were on it, the weights were on it; very similar.

3    And it's my belief that those drugs were from

4    Mr. Jarvis.

5        Q.    But you don't have any evidence either of

6    Mr. LaMonte himself stating that the marijuana came

7    from the Jarvis drug trafficking organization?

8        A.    Mr. LaMonte stated he worked for

9    Mr. Osgood.  And he met with Rafal Mistrzak a/k/a

10   Alex in Middletown, New York, and delivered bulk US

11   currency.  That's the statements from Mr. LaMonte.

12       Q.    And when did he meet Rafal, Mr. Mistrzak,

13   in Middletown, New York?

14       A.    Several times.  I believe it was on three

15   or four occasions he met and passed on bulk US

16   currency.

17       Q.    What years are we talking about?

18       A.    2000, 2001.

19       Q.    Do you have any evidence that shows

20   Mr. Osgood knew Mr. Mistrzak?

21       A.    I would have to review what we have.  It's

22   a very large, complex case, and I couldn't testify

23   to that today.

24       Q.    So you can't testify to any evidence that

25   Osgood knew Mr. Mistrzak?

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 84

1    A.    I couldn't testify as to what proof we

2    had, no.

3    Q.    Okay.  Let's talk a little bit about

4    Mr. LaMonte.  Can you tell me what his criminal

5    history is?

6    A.    I cannot.

7    Q.    Isn't it true that he's been locked up

8    most of his life?

9    A.    I know he has a substantial criminal

10   history.

11   Q.    And he did some time in California as a

12   very violent felon?

13   A.    I don't have his report in front of me,

14   and I can't testify to that.

15   Q.    What were the circumstances surrounding

16   his debrief with the government?

17   A.    In searching for Mr. Osgood, the United

18   States Marshals Service in New York developed a lead

19   somehow -- I don't know the details about it -- that

20   led them to Mr. LaMonte.  Mr. LaMonte then provided

21   some information that ultimately led to the capture

22   of Mr. Osgood.

23   Q.    Were those reports turned over to the

24   government?

25   A.    I don't believe there were any reports.

**PAUL BACA, OFFICIAL COURT REPORTER**

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 85

1    Q.    The Marshals Service didn't write any

2    reports regarding Mr. Osgood's capture?

3    A.    I think they talked to -- as far as the

4    arrest, when Mr. Osgood was captured in the state of

5    Colorado.  But I believe that they obtained a name

6    that Mr. Osgood may have been using as an alias, and

7    I believe that led to Mr. Osgood's capture.

8    Q.    Did the Marshals Service write a report

9    regarding their interview with Mr. LaMonte?

10    A.    No, they did not.  They asked that I come

11    out and interview him.

12    Q.    And when did you do that interview?

13    A.    That was early February.

14    Q.    Is Mr. LaMonte working off any charges to

15    provide this information to the DEA or the Marshals

16    Service?

17    A.    Not to my knowledge.  I don't know the

18    circumstances regarding that.

19    Q.    Has anyone contacted Mr. LaMonte -- any

20    prosecutors that have charged Mr. LaMonte?  And is

21    he going to get a benefit from providing this

22    testimony to the government?

23    A.    I don't know any details about that.

24         MR. BRAUN:  Your Honor, first of all, I

25    would object to the relevance of that for the

**PAUL BACA, OFFICIAL COURT REPORTER**

1    purposes of this hearing.

2            But to the extent it is relevant, I would

3    proffer that in fact Mr. LaMonte was provided a

4    benefit.  I believe he was charged with some sort of

5    aggravated assault initially that he was in custody

6    on.

7            The DA's office out in Middletown, New

8    York, agreed to allow him to plead to a misdemeanor

9    in exchange for his cooperation in this case.  And

10   so his sentence was substantially reduced because of

11   his cooperation.

12           But I don't believe his credibility is

13   necessarily relevant for this hearing.  That will,

14   of course, all be produced in advance of trial, in

15   accordance with the Court's standing discovery

16   order.

17           THE COURT:  All right.  Thank you,

18   Mr. Braun.

19           MS. SIRIGNANO:  Your Honor, I just would

20   like to make a record that his credibility is

21   absolutely relevant at this hearing and at any

22   hearing down the road and at trial and that the

23   evidence that the government has obtained from

24   Mr. LaMonte has been procured under what Mr. Braun

25   called a substantial benefit for sentencing.

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 87

1           And they raised it, and I'd like to

2    inquire more about Mr. LaMonte.

3           THE COURT:  Well, I'm not sure what you

4    want to ask.  But you can ask your questions, and

5    we'll take it from there.

6           MS. SIRIGNANO:  Thank you, Your Honor.

7      Q.   (By Ms. Sirignano)  Regarding Mr. LaMonte,

8    isn't it possible that he was doing this on behalf

9    of a boss?  You mentioned a boss.  That it could

10   have been someone else providing the marijuana,

11   perhaps a family member or someone else on the East

12   Coast?

13     A.   He stated that his boss, as far as the

14   bulk marijuana that he transported, was George

15   Osgood.  He said that he was supplied by Mr. Osgood.

16   And he actually mentioned that his mother was a drug

17   trafficker and he was a drug trafficker, and

18   Mr. Osgood supplied them.

19     Q.   What was his mother's involvement with

20   Mr. Osgood?

21     A.   They had been long friends and drug

22   traffickers and associates for many years.  He said

23   that Mr. Osgood would supply his mother with drugs

24   to sell.  And when Mr. Osgood was out, his mother

25   would supply Mr. Osgood.  It was kind of a -- he

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 88

1  described his growing up in a quote, unquote,

2  cornucopia of drug use.

3      Q.    Did his mother get the marijuana from the

4  Jarvis organization?

5      A.    Ultimately his mother was arrested, I

6  believe, with 5 pounds of marijuana that Mr. LaMonte

7  took from the bales that he had picked up and

8  transported for Mr. Osgood.  And then she picked up

9  5 pounds of marijuana and left and was arrested with

10  that 5 pounds.

11      Q.    But where did the marijuana come from

12  initially?

13      A.    It came from Mr. Osgood's direction of

14  where to pick it up.  He would pick it up at like a

15  rest stop or a truck stop or something in

16  Pennsylvania.  And he knew where to go.  And he was

17  directed to go to that location and pick up a van, a

18  minivan, with bulk marijuana that was wrapped as

19  described earlier and placed in duffle bags.

20      Q.    But isn't it true that you don't have any

21  evidence that links that to the Jarvis organization?

22  Osgood could have gotten it from anybody on the East

23  Coast, correct?

24      A.    The fact that the proceeds from the

25  distribution of that bulk marijuana were then sent

**PAUL BACA, OFFICIAL COURT REPORTER**

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 89

1    back through Rafal Mistrzak I think deifies that

2    claim.

3        Q.    So what evidence do you have that that

4    specific load that was picked off the mother went

5    back to Rafal Mistrzak?

6        A.    No.  I think you're getting confused.  The

7    5 pounds that Mr. LaMonte's mother was arrested with

8    came from Mr. LaMonte that he broke off one of the

9    bales that he picked up from Mr. Osgood.

10       Q.    That he picked up directly from Osgood, or

11   from a location?

12       A.    No, at Osgood's direction.

13       Q.    Correct.  So where did the marijuana come

14   from?  You don't have any evidence to say that

15   Osgood got that marijuana from Jarvis, correct?

16       A.    Mr. LaMonte's information was that he

17   would go to Pennsylvania, pick up a van at

18   Mr. Osgood's direction, and then take that to a

19   certain location per Mr. Osgood's direction.

20       Q.    But you're not answering my question.  You

21   don't have any evidence that that marijuana that

22   Osgood directed LaMonte to pick up came directly

23   from the Jarvis organization, do you?

24       A.    That the specific bales came directly from

25   Dana, no.

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 90

1      Q.    You also in your report stated in

2    paragraph 21 that you did a photo spread, or you

3    showed several photographs of individuals involved

4    in the Jarvis drug trafficking organization to

5    Mr. LaMonte, correct?

6      A.    That is correct.

7      Q.    And was it a photo spread?

8      A.    No.

9      Q.    What kind of photos were shown?

10     A.    It's driver's license photos.

11     Q.    Individual photos?

12     A.    Individual photographs.

13     Q.    And who was Mr. LaMonte able to recognize?

14   Well, let me go -- let me ask a better question.

15           Whose photos did you show him?

16     A.    I showed him a whole range of photographs.

17   And the only person that Mr. LaMonte was able to

18   identify from those photographs was Mr. Osgood.

19     Q.    Okay.  When you say a range of photos,

20   which persons did you show him?

21     A.    There's, I believe, 50 or 80 different

22   photographs.

23     Q.    Did that include Dana Jarvis?

24     A.    It did.

25     Q.    Did it include Mr. Hill?

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 91

1      A.    It did.

2      Q.    Did it include Mr. Wilson?

3      A.    It did.

4      Q.    Did it include Mr. Nash's client?

5      A.    It did.

6      Q.    Did it include Mr. Mistrzak?

7      A.    Yes, it did.

8      Q.    Did it include all the named defendants in

9  the indictment, the superseding indictment, that's

10 before the Court?

11     A.    Yes.

12     Q.    Okay.  So it's fair to say that he wasn't

13 familiar with anybody in the Jarvis drug trafficking

14 organizations, except for Mr. Osgood, correct?

15     A.    That is correct.  And with Mr. Mistrzak,

16 he could not identify Mr. Mistrzak a/k/a Alex from

17 the driver's license photograph.

18     Q.    Okay.  And so I'm sorry to have to go back

19 to this because I'm still not up on all the

20 discovery.  How many times did Mr. LaMonte meet

21 Mr. Mistrzak?

22     A.    I believe it's in the report.  And to my

23 memory, it was three to four or four to five,

24 something like that.

25     Q.    In the report that I was given yesterday?

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 92

1     A.    That is correct.

2           THE COURT:  We're going to have to break

3     about now.  I'm going to -- I have another matter I

4     need to attend to.  So we'll reconvene at 1:30.

5           MS. SIRIGNANO:  Thank you, Your Honor.

6     Lunch.

7           (Court in recess from 11:30 to 1:31.)

8           MS. SIRIGNANO:  Thank you, Your Honor.

9           Good afternoon, Agent Stark.

10          THE WITNESS:  How are you?

11          MS. SIRIGNANO:  Good, thank you.

12    Q.    (By Ms. Sirignano)  I think we were talking

13    about LaMonte, J.D. LaMonte.  So if I recollect

14    properly, you had testified that Mr. Osgood would

15    supply Mr. LaMonte's mother, and then Mr. LaMonte's

16    mother would supply Mr. Osgood at times; is that

17    correct?

18    A.    Yes.  He said that in the old days, which

19    was prior to the 2000/2001 time frame -- he stated

20    that his mother trafficked in drugs and was supplied

21    by Mr. Osgood.  And then if Mr. Osgood was out, his

22    mother would supply him.  You know, he didn't talk

23    about himself at that point.

24    Q.    Okay.  And you said drugs, correct?

25    A.    Correct.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 93

1    Q.    So we're talking about LSD, mushrooms,

2    cocaine, methamphetamine?

3    A.    He quote, unquote, stated that it was a

4    cornucopia of drug use.

5    Q.    And is there any evidence that the Jarvis

6    drug trafficking organization trafficked LSD, coke,

7    methamphetamine and mushrooms as well, during that

8    time?

9    A.    No.

10    Q.    So it's fair to say that Mr. LaMonte's

11    mother was a source of supply as well, correct?

12    A.    She was a source -- yeah, I would, yes.

13    Q.    And independent of the Jarvis drug

14    trafficking organization?

15    A.    Yes.

16    Q.    Did you speak to Mrs. LaMonte?

17    A.    No, ma'am.

18    Q.    Do you know her first name?

19    A.    No, ma'am.

20    Q.    Is she still alive?

21    A.    I believe so.  As a matter of fact, yes,

22    she is.

23    Q.    Can you tell us where Mr. Osgood is in the

24    hierarchy of the Jarvis drug trafficking

25    organization?

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 94

1      A.    Mr. Jarvis, as I stated before, you know,

2   brought the bulk marijuana in from the Republic of

3   Mexico.  And I think the best way to describe it is

4   he distributed the bulk marijuana to certain cells

5   around the country.  And Mr. Osgood was part of that

6   cell in New York and Connecticut.

7      Q.    What years?

8      A.    Depending on who you ask within the

9   organization, from 1998, '99 on.  Some people say he

10  had been with Mr. Jarvis for 35 years.

11     Q.    And Mrs. LaMonte wasn't in the hierarchy

12  of the Jarvis drug trafficking organization?

13     A.    No.  I think she was a completely separate

14  entity.

15     Q.    Do you know if Mrs. LaMonte was directing

16  J.D. LaMonte at any time?

17     A.    I don't know that, no.

18     Q.    Is it possible that Mrs. LaMonte was the

19  one that was orchestrating this marijuana that you

20  outlined in you report, instead of Mr. Osgood?

21     A.    I don't believe so.  I think he would have

22  stated that, you know, my mom directed me to do

23  such-and-such.

24          And he stated that Mr. Osgood gave him

25  directions where to pick the bulk marijuana up,

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 95

1    where to store it, to inventory it.  He stated that

2    the boss is going to need those numbers from the

3    inventory.  And then he also directed Mr. LaMonte to

4    meet with Alex, which we know as Rafal Mistrzak.

5        Q.    And let's talk about that.  You testified

6    that Mr. J.D. LaMonte couldn't identify Alex or

7    Rafal Mistrzak, correct?

8        A.    From the driver's license photograph that

9    we showed him at the time, he could not identify him

10   from that photograph.

11       Q.    So it's fair to say there's a number of

12   Alexes probably living in Middletown or who had

13   lived in Middletown anywhere during that time frame

14   of 2000/2001?

15       A.    Well, he described the vehicle that Alex

16   was driving.  He said it was a dark-colored Honda or

17   Acura.  And I know for a fact that Mr. Mistrzak

18   drove a dark-colored Honda.

19       Q.    You also referred to the packaging of the

20   marijuana that was the subject of your report with

21   Mr. LaMonte.  And in your last testimony, you said

22   it was consistent with the Jarvis drug trafficking

23   organization; is that right?

24       A.    That is correct.

25       Q.    And so can you explain what that signature

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 96

1   would be and what kind of packaging is consistent

2   with the Jarvis drug trafficking organization?

3       A.    Primarily before they started flying

4   product aboard the aircraft, the bulk marijuana was

5   packaged primarily in duffle bags, dark-colored

6   duffle bags, and then placed in minivans.

7            And then they used things they called

8   props to put on top of the duffle bags, whether it

9   be, you know, kegs of beers, pipes, fishing gear,

10  things like that, to disguise what was underneath

11  the props.

12           In addition, the loads were wrapped in

13  cellophane, standard cellophane and contact paper.

14  The bale numbers were written on the bales, and the

15  weights of the bales were written on them as well.

16           Mr. LaMonte stated that he picked up

17  minivans.  The bulk marijuana was packaged in duffle

18  bags, props were on top of them, and the marijuana

19  was packaged as described.

20      Q.    But there was a variance in Mr. Jarvis'

21  signature packaging in terms of you testified that

22  some of the times, the cellophane was thin or wasn't

23  packaged?

24      A.    Actually, that was a rare occasion.  That

25  stuck out in Ayla Jarvis' mind.  She was very

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 97

1    worried for her father because the bulk marijuana

2    was packaged so thinly that time that was placed in

3    the suitcases.

4            And as a matter of fact, in the phone

5    conversation that she had with Adrian Sanford

6    afterwards, she said, "We had never done it this

7    way."  It was either with her father or Adrian.  But

8    in one of those conversations, she said, "We've

9    never packaged it like this before."

10    Q.    And another difference would be duffle

11    bags versus suitcases, correct?

12    A.    Duffle bags was the primary way that the

13    marijuana was transported across the country in

14    vehicles.  And then when they began flying product

15    aboard the aircraft, that's when they switched to

16    suitcases.

17    Q.    Going back to Mr. Jarvis' or Mr. Osgood's

18    role in the organization, you said that he ran a

19    cell in the New York/Connecticut area, correct?

20    A.    That is correct.

21    Q.    And so who did he work directly for?

22    A.    Mr. Jarvis.

23    Q.    And what was his job?

24    A.    Well, he distributed marijuana on the East

25    Coast of the United States and then funneled that

**PAUL BACA, OFFICIAL COURT REPORTER**

1    money back to Mr. Jarvis.  The drug proceeds were

2    then funneled back to Mr. Jarvis.  And then more

3    marijuana was shipped out to Mr. Osgood to

4    distribute to make a profit on.

5         Q.    So are you alleging that he -- I'm just

6    trying to clarify your statement.  Are you alleging

7    that he was the one actually doing the distribution

8    and the money back to Mr. Jarvis, or what's his

9    exact role?

10        A.    Well, as a distributor, you then pass that

11   marijuana on either to individuals that then sell

12   for you or you sell it directly.  And as a

13   distributor, you are then responsible for getting

14   money back from whoever you gave the marijuana to

15   and then passing that money back to your source of

16   marijuana.

17        Q.    And you have evidence that Mr. Osgood did

18   both?

19        A.    Well, yes.

20        Q.    Okay.  What years?

21        A.    Well, like I said, depending on who you

22   speak with.  Some people said that Mr. Osgood had

23   been working with Mr. Jarvis for 35 years.  Other

24   people that came in, for instance, Joseph Martin,

25   said that Mr. Osgood -- that he started working for

Page 99

1    the organization in approximately '98 or '99.  He

2    said that they were shipping 3- to 400-pounds to

3    Mushroom George, which was a/k/a George Osgood, 3-

4    to 400-pounds at a time.

5              Ayla Jarvis delivered 100 pounds to

6    Mr. Osgood and placed it in the trunk of his car in

7    the state of Pennsylvania.

8              Donald Trujillo, as I testified to

9    earlier, picked up marijuana from Mr. Osgood and

10   brought it back.  George Ripley took marijuana

11   directly to Mr. Osgood.

12        Q.    Let's talk about Donald Trujillo.  I got a

13   little confused here with Donald Trujillo and

14   Russell Trujillo.  Your prior testimony was that, if

15   I'm correct, Donald Trujillo picked up 100 pounds in

16   New York and drove it to Columbus, Ohio, through a

17   circuitous route and went to Chicago; is that

18   correct?

19        A.    That is correct.

20        Q.    So what year was that?

21        A.    I believe it was sometime after 2000,

22   between 2002 and 2005.

23        Q.    Can you narrow it down a little bit?

24        A.    No, not today.  I don't know if

25   Mr. Trujillo placed the date on that load.

**PAUL BACA, OFFICIAL COURT REPORTER**

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 100

1      Q.    And I was following your testimony.  Did

2   that involve Mr. Reid at all?

3      A.    Did what?

4      Q.    That hundred pounds in New York and drove

5   it to Columbus, Ohio, did that involve Mr. Reid?

6      A.    Not to my knowledge.

7      Q.    No?  Okay.  Who else was there during this

8   delivery?

9      A.    I think the information from Donald

10  Trujillo was that he picked up a load from

11  Mr. Osgood and took it to Columbus, Ohio.  I don't

12  know if we have any other information if anybody

13  else was there at the time.

14     Q.    Okay.  How many pounds are we talking

15  about?

16     A.    I believe I testified that it was

17  100 pounds of marijuana from New York to Columbus,

18  Ohio, that eventually wound up in Chicago, Illinois.

19     Q.    The load ended up in Chicago, Illinois?

20     A.    Yeah.  It was taken to Columbus, Ohio.

21  It's a little confusing because I think they picked

22  up another 250 pounds.  Whether that was added to it

23  or not, that's what I'm not sure about.  But it

24  eventually wound up in Chicago.

25     Q.    And who was the contact in Chicago?

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 101

1      A.    I don't know.

2      Q.    Did the DEA ever do any organizational

3  charts about the Jarvis drug trafficking

4  organization say in 2000?

5          MR. BRAUN:  Objection, relevance.

6          MS. SIRIGNANO:  It goes directly to the

7  conspiracy, Your Honor.  Who was in the conspiracy?

8          THE COURT:  The objection is overruled.

9      A.    We had, you know, pages up on the wall

10  that we would list people's names and their roles

11  within the organization.

12     Q.   (By Ms. Sirignano)  And so your indictment

13  alleges from 1990 through 2005.  How many different

14  organizational charts did you do?

15     A.    I think there was only one the whole time.

16  We just added to things and took things away.

17     Q.    Was that produced to the government?

18     A.    Pardon?

19     Q.    Was that produced to the defense, your

20  organizational chart?

21     A.    I don't believe so.  I think it's just a

22  working product that the agents used.

23     Q.    You testified earlier today and just now

24  that the drug trafficking organization would change.

25  People would come in and people would leave the

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 102

1    group; isn't that correct?

2        A.    There were certain individuals that would

3    come into an organization and then leave.  Other

4    individuals would come.  And you know, when they

5    left, they left for good.  But the core group of

6    people in this organization stayed the same.

7             And there were other individuals, you

8    know, throughout the conspiracy that were in and out

9    of the organization.  But the core group of people

10   within that organization pretty much stayed the

11   same.

12       Q.    And who would you consider the core group?

13       A.    I'd have to look at a list of names.  But

14   Dana Jarvis, Cathy Fitzgerald.  There was Joe

15   Martin, George Osgood, Greg Hill; most of the

16   people, you know, that were listed on the

17   indictment.  I'd have to look at the names.

18            But there were a lot of old time

19   individuals, George Ripley, that pretty much stayed

20   the same.

21       Q.    And did these people have roles, like

22   enforcers or protectors or bosses, anything like

23   that?

24       A.    Yes.  Early on in the organization, I

25   believe that the roles were a little bit more

**PAUL BACA, OFFICIAL COURT REPORTER**

1    clearly defined in the sense that, for instance,

2    Geno Berthod said -- he was another core person; Dan

3    Shulman.  But he said that his role was to take bulk

4    marijuana from Colorado to Bloomington, for

5    instance, and that was his role.  His role wasn't to

6    bring back money or that kind of thing.

7            But later, when Mr. Jarvis needed help

8    with things quickly, then those roles kind of

9    transformed a little bit.  Donald Trujillo's primary

10   role was distributing bulk marijuana, but was then

11   also transitioning to transporting bulk US currency

12   that were drug proceeds as well.

13   Q.    So tell me, in terms of distribution

14   versus transporting currency, what was George

15   Osgood's role?

16   A.    As I stated before, to my knowledge,

17   Mr. Osgood's role was a cell head in Connecticut and

18   New York that accepted bulk marijuana, distributed

19   it there and then funneled money back to the Dana

20   Jarvis organization through certain individuals.

21   Q.    Which individuals?

22   A.    Primarily Alex, but there were other money

23   couriers as well.

24   Q.    Who's that?

25   A.    I don't know if Dakota Fitzner went to New

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 104

1    York or not.  But Dakota Fitzner was a money

2    courier, Barbara Hanna, Willow Adams.  There were

3    several.

4        Q.    Isn't it true that Mr. Jarvis, Dana

5    Jarvis, kept these groups separate, the people that

6    delivered marijuana versus people that received the

7    cash or the currency?

8        A.    He pretty much separated people's roles so

9    no one person would know the overall scope of the

10   drug organization.

11       Q.    So it's fair to say that many people in

12   this alleged overarching conspiracy didn't even know

13   each other?

14       A.    That's correct.

15       Q.    And part of the group would deliver by

16   land, and part of the group would deliver by

17   airplane, and they didn't know each other?

18       A.    Well, actually it was primarily by land.

19   That's by vehicle.  That was the way that the bulk

20   marijuana was distributed throughout the United

21   States until right near 2004, 2005.

22           That's when they transitioned to moving

23   bulk marijuana by airplane.  You know, it was

24   somewhat by ground, somewhat by air.  But it wasn't

25   until the very end that it went by air.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 105

1    Q.    So it's fair to say that a lot of the

2  people who were in this alleged conspiracy that were

3  doing the transporting by land never knew the people

4  that were transporting by airplane later on in 2004,

5  2005?

6    A.    Not necessarily.  Because for instance,

7  Salvador Abeyta, who was a bulk marijuana

8  transporter for the Jarvis organization, was in

9  Tucson, Arizona, when they loaded bags.  Salvador --

10  Sam Jones was a bulk marijuana courier for the

11  Jarvis organization at times.  He was there, loading

12  those bags.  Ayla Jarvis was there, loading those

13  bags.

14        So there were people that knew about

15  transporting by ground that then later discovered

16  they were transporting by air.

17    Q.    But Mr. Osgood never was in Mr. Reid's

18  plane or never did any air courier that you know of;

19  is that correct?

20    A.    I know that the plane flew to Connecticut

21  to pick up bulk cash.  And to my knowledge, I don't

22  believe Mr. Osgood was ever aboard Mr. Jarvis'

23  aircraft.

24        I believe there were conversations about

25  trying to arrange flights aboard the aircraft, but I

**PAUL BACA, OFFICIAL COURT REPORTER**

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 106

1    don't know if they ever took place.

2        Q.    Okay.  Can you describe the DEA's

3    investigation in place prewiretap in Tucson?

4            MR. BRAUN:  Objection, relevance.

5            MS. SIRIGNANO:  It was already brought up

6    on direct, Your Honor.  And it was the initiation of

7    this case, and it's relevant to the investigation.

8            THE COURT:  Any further response?

9            MR. BRAUN:  I just asked Agent Stark to

10   begin with when his investigation began.  Details

11   about the investigation aren't relevant to the facts

12   that the witnesses would testify to establishing the

13   existence of the conspiracy, which is why we're here

14   today.

15           MS. SIRIGNANO:  Agent Stark did talk about

16   S.A. Hella and information that he received from

17   S.A. Hella.  And that information goes directly to

18   how the conspiracy was established and who was part

19   of that conspiracy.

20           THE COURT:  All right, I'll allow the

21   question.

22           MS. SIRIGNANO:  Do you need me to repeat

23   it?

24           THE WITNESS:  No.

25       A.    As stated previously, my partner currently

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 107

1    here on this case, Special Agent Hella, was at the

2    time stationed in Tucson, Arizona.  And to my

3    knowledge, she got some information about the Jarvis

4    drug trafficking organization and passed that

5    information to me.

6              I'm not sure that they ever opened an

7    official case in Tucson until we from New Mexico

8    started feeding the Tucson office information

9    regarding Dana Jarvis years later.

10   Q.   (By Ms. Sirignano)  What year did they open

11   up an investigation in Tucson?

12   A.   I don't think they ever did.  Oh.  Do you

13   mean the investigation with our information from New

14   Mexico?

15   Q.   Yes.

16   A.   I don't know.  But I suspect that it was

17   around the time of the initiation of the wiretaps.

18   Q.   And who was S.A. Hella getting the

19   information about the Jarvis drug trafficking

20   information from?

21             MR. BRAUN:  Objection, relevance.  This

22   goes to a confidential source that's not relevant to

23   this hearing.

24             MS. SIRIGNANO:  Well, is the confidential

25   source a member of the conspiracy?

**PAUL BACA, OFFICIAL COURT REPORTER**

1          THE COURT:  Are you rephrasing the

2    question?

3          MS. SIRIGNANO:  I can rephrase it.  If the

4    identity -- well, let me rephrase it.

5      Q.   (By Ms. Sirignano)  Is the confidential

6    source that S.A. Hella got information from part of

7    the Jarvis drug trafficking organization?

8          MR. BRAUN:  Objection, relevance.  We're

9    here to talk about witnesses who are going to

10   testify at trial, not sources of information that

11   started the investigation.

12         MS. SIRIGNANO:  And Your Honor, my

13   statement would be that if this confidential

14   informant was part of the drug trafficking

15   organization, then he is a possible co-conspirator.

16   And whether or not he testifies at trial, it doesn't

17   matter, especially since he's part of the drug

18   trafficking organization and he's feeding

19   information to the agents to develop this

20   overarching conspiracy.

21         And so all I'm asking is whether or not

22   he's part of the drug trafficking organization

23   that's relevant to this hearing.

24         THE COURT:  Anything further, Mr. Braun?

25         MR. BRAUN:  No, Your Honor.

Page 109

1          THE COURT:  All right.  The objection is

2   sustained.

3      Q.   (By Ms. Sirignano)  So for clarification,

4   Agent Stark, did Tucson have an open investigation

5   prewiretap in Tucson?

6      A.   I don't know the exact date that they

7   opened their case.  It could have been right after

8   the wiretap was initiated; it could have been just

9   prior to.

10     Q.   Were there any wiretaps in Houston that

11  were fed into this case, any statements from any

12  wiretaps in Houston that were fed into this case?

13     A.   What does Houston have to do with it?

14     Q.   I'm sorry, Tucson.  I apologize.  Tucson.

15     A.   No, not to my knowledge.

16     Q.   Okay.

17          MS. SIRIGNANO:  May I have a moment, Your

18  Honor?

19          THE COURT:  Yes.

20          MS. SIRIGNANO:  Okay, just the last few

21  questions here.

22     Q.   (By Ms. Sirignano)  You testified about a

23  wiretapped call between Mr. Osgood and Dana Jarvis

24  about 30 pages.  Can you explain this call?

25     A.   Yes.  Mr. Jarvis was speaking to

**PAUL BACA, OFFICIAL COURT REPORTER**

1    Mr. Osgood.  And that was a code that they used to

2    describe their paperwork that was the bulk cash.

3              And paraphrasing, because I don't have the

4    call in front of me, but Mr. Osgood stated that he

5    had 30 pages collected.  And so that means $30,000.

6    Q.    Okay.  How do you know that 30 pages means

7    $30,000?

8    A.    From cooperating defendant witnesses, from

9    listening to the wiretap investigation and

10   discovering that that was their code for money.

11   Q.    And isn't it true that the DEA doesn't

12   know if $30,000 was collected or not?

13   A.    I'm not quite sure what you're asking.

14   Q.    Does the DEA have proof that $30,000 was

15   collected by Mr. Osgood on behalf of Mr. Jarvis

16   during the time of this call?

17   A.    I don't know.  I don't think we had a

18   seizure.

19   Q.    You don't think you had a seizure?

20   A.    No.

21   Q.    This statement was, "Well, what's

22   happening is that I have to wait until Monday

23   anyhow.  And then he'll have, I think he said, about

24   30 pages done."

25   A.    And I believe that was in April.  And

1    Mr. Osgood flew aboard a commercial airliner, I

2    believe prior to that, to Hartford, Connecticut.

3          That conversation took place a short time

4    thereafter.  He initially flew to Albuquerque and

5    went to George Ripley's residence.  I actually

6    observed him at Mr. Ripley's residence that evening.

7          And then Mr. Ripley testified that he said

8    he had to go see Cathy Fitzgerald about something.

9    And Mr. Ripley's assumption was that because Cathy

10   accepted money on behalf of the Jarvis organization,

11   that he was bringing money back to Mr. Jarvis

12   through Cathy Fitzgerald.

13   Q.    And where was Mr. Osgood when this call

14   happened, back East?

15   A.    Back East is my assumption.  I don't know

16   if we had -- I'd have to review the phone number and

17   everything else.

18          But he had flown out, I think, just prior

19   to that and landed in Hartford, Connecticut.  So my

20   understanding was that he was in the state of

21   Connecticut or New York.

22   Q.    And did the DEA do any surveillance on him

23   while he was in Connecticut or New York?

24   A.    No.

25   Q.    So you have no evidence that 30 pages or

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

Page 112

1    $30,000 was picked up wherever Mr. Osgood was at

2    that time?

3        A.    We don't have any actual surveillance

4    evidence, no.

5        Q.    What other evidence do you have that that

6    transaction occurred?

7        A.    What I testified to earlier, the phone

8    conversations, the surveillance, him coming back and

9    meeting with members of the Jarvis drug trafficking

10   organization and cooperating defendant witness

11   statements.

12       Q.    But you never saw the $30,000?

13       A.    No, ma'am.

14       Q.    You never picked up 30,000 from George

15   Ripley or Cathy Fitzgerald or anybody else like

16   that?

17       A.    No, ma'am.

18       Q.    Okay.

19             MS. SIRIGNANO:  I think that's all I have,

20   Your Honor.  Thank you.

21             MR. NASH:  If I may, Your Honor, there's

22   one brief area that I forgot to address.  I spoke

23   with Mr. Braun and Mr. Stark about it during the

24   break, and they have no problem with me doing it

25   now, subject to the Court's approval.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 113

1          THE COURT:  All right.  You may proceed.

2          MR. NASH:  Thank you.

3               FURTHER CROSS-EXAMINATION

4  BY MR. NASH:

5     Q.    Sir, I want to focus on cash and money

6  seizures during two periods that we've talked about.

7  The first is -- let's go to 2002, when you opened

8  you case on this, to March of 2005, when the wire

9  goes out.  You told us about a pretty carefully

10 orchestrated organization that resulted in the

11 seizure of money from Ayla Jarvis.

12    A.    That's correct.

13    Q.    Were there any other seizures of cash or

14 of drugs that are related to this case during that

15 period?

16    A.    Before the wiretap investigation in 2005,

17 we seized the money from Ayla Jarvis.  And we also

18 tied -- we had no direction in this.  It was after

19 the fact that we tied a $400,000 bulk currency

20 seizure from Cara Gold and Jude Austin.

21         And I might have to review the dates.  It

22 was, I believe, December 2002, maybe 2003.  I'd have

23 to check when they were stopped.  But we tied that

24 to the Jarvis organization as well.

25    Q.    That would be likely the other cash

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 114

1    seizure in '90 or '92 that a retrospective

2    investigation brought within this?

3        A.    That's correct.

4        Q.    But there were no actual other seizures

5    during that period?

6        A.    No, sir.

7        Q.    Let's move ahead to period number two,

8    which is postinitiation of the wire until the time

9    of indictment.

10           You talked about the July Russell Trujillo

11    seizure that was half of a load involving Ayla and

12    also, I believe, a May 20th, '05, seizure in

13    Nebraska, Donald Trujillo.

14           The Jarvis seizure -- the Russell

15    Trujillo, excuse me, would have been again an

16    orchestrated operation that was spinning off of this

17    investigation.  You told us that Donald Trujillo was

18    a standalone fluke, basically?

19        A.    Yes.  We have no knowledge of that.

20        Q.    Were there any other seizures of drugs or

21    money during that second period?

22        A.    There was a small amount of marijuana

23    seized from Manuel Gil, and I don't remember the

24    date.  There was also approximately $237,000 in bulk

25    US currency seized from Geno Berthod in the state of

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59

1    Colorado.

2        Q.    Anything else?

3        A.    Not that I can remember at this time.

4        Q.    And you and I talked about what my

5    questions would be before we broke.  And I presume

6    the new information comes from reviewing your memory

7    and/or notes, and I appreciate that.

8            Let me ask you a couple of brief questions

9    about those two new things you just told me about.

10   The small amount of marijuana in the Guild case, was

11   that also a handoff?  Was it a spinoff out of your

12   investigation?

13       A.    It was a spinoff from our investigation.

14       Q.    In 25 words or less, tell us how it spun

15   off.

16       A.    We received information that Manuel Gil

17   was in Tucson, wrapping a load, per intercepted

18   telephone conversations, that he was on his way

19   back.  And when he arrived in Albuquerque, a car

20   stop was performed, and they found a small amount of

21   marijuana in his vehicle.

22       Q.    The same question, sir, about the $237,000

23   cash seizure.

24       A.    Pretty much the same thing.  Intercepted

25   telephone conversations between Dana Jarvis and

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 116

1    Donald Trujillo where Donald Trujillo was directed

2    to meet with the Old Man to pick up a massive check,

3    I think was the term.

4              Agents in Colorado were directed by me,

5    and they established surveillance on Mr. Berthod.

6    Then when he left town, they performed a car stop

7    and they found the bulk US currency inside his

8    vehicle.

9              MR. NASH:  Thank you.

10             That's all I have, Your Honor.

11             THE COURT:  All right.  Redirect?

12             MR. BRAUN:  I have no redirect, Your

13   Honor.

14             THE COURT:  All right.  Thank you for your

15   testimony today, Mr. Stark.

16             Mr. Braun, do you have anything else you

17   want to present?

18             MR. BRAUN:  No, Your Honor.  The

19   government would rest.

20             THE COURT:  Is there anything that the

21   defense intends to present?

22             MS. SIRIGNANO:  No, Your Honor.  Thank

23   you.

24             MR. NASH:  By way of evidence, no, ma'am.

25             MR. BLACKBURN:  No, Your Honor.

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 117

1            THE COURT:  All right.  Thank you.

2            Anything further?

3            MR. BRAUN:  No, Your Honor.  I think Agent

4   Stark's testimony speaks for itself as far as

5   establishing the existence of the conspiracy and

6   that these three defendants were members of that

7   conspiracy at least at some period of time.

8            MR. NASH:  I have nothing further.  We've

9   already talked about the limited parameters of this

10  hearing.

11           MR. BLACKBURN:  I have nothing further,

12  Your Honor.

13           THE COURT:  All right.  Thank you.  Well,

14  we'll be in recess.  I will get you my decision in

15  the next couple of days.

16           MR. BRAUN:  Thank you, Your Honor.

17           MR. NASH:  Thank you.

18           (Court in recess at 2:06 p.m.)

19

20

21

22

23

24

25

**PAUL BACA, OFFICIAL COURT REPORTER**

Page 118

1

2

3                    REPORTER'S CERTIFICATE

4              I, Paul Baca, Official Court Reporter for

5    the US District Court, District of New Mexico, do

6    hereby certify that I reported the foregoing

7    proceedings in stenographic shorthand and that the

8    foregoing pages are a true and correct transcript of

9    those proceedings and was reduced to printed form

10   under my direct supervision.

11              I FURTHER CERTIFY that I am neither

12   employed by nor related to any of the parties or

13   attorneys in this case and that I have no interest

14   in the final disposition of this case.

15

16

17          _____
            PAUL BACA
18          NM Certified Court Reporter No. 112
            License Expires:  12/31/09
19

20

21

22

23

24

25

a6d16236-58a8-4e9e-8fb3-c19b4fbe2e59